

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-27-2001

# GM Corp Chevrolet v. New A.C. Chevrolet

Precedential or Non-Precedential:

Docket 00-5251

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"GM Corp Chevrolet v. New A.C. Chevrolet" (2001). *2001 Decisions.* Paper 195.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/195

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 27, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-5251

GENERAL MOTORS CORPORATION
CHEVROLET MOTOR DIVISION

v.

THE NEW A.C. CHEVROLET, INC.
dba THE NEW A.C. CHEVROLET,
        Appellant

On Appeal from the United States District Court
For the District of New Jersey
(D.C. Civil No. 98-cv-00112)
District Judge: Honorable Faith S. Hochberg

Argued: November 30, 2000

Before: BECKER, Chief Judge, RENDELL and
MAGILL,* Circuit Judges.

(Filed: August 27, 2001)

        WILLIAM F. LANG, III (ARGUED)
        MARTIN G. MARGOLIS, Esq.
        THOMAS G. RUSSOMANO, Esq.
        The Margolis Law Firm, P.A.
        60 Pompton Avenue (Route #23)
        Verona, New Jersey 07044

          Counsel for Appellant
_____

* Honorable Frank S. Magill, Senior Judge of the United States Court of
Appeals for the Eighth Circuit, sitting by designation.

LAWRENCE S. BUONOMO, ESQ.
GM Legal Staff
General Motors Corporation
3031 West Grand Boulevard
Detroit, MI 48232

DANIEL L. GOLDBERG, ESQ.
  (ARGUED)
ALICIA L. DOWNEY
Bingham Dana LLP
150 Federal Street
Boston, MA 02110

LOIS H. GOODMAN, ESQ.
Carpenter, Bennett & Morrissey
100 Mulberry Street
Three Gateway Center
Newark, NJ 07102

 Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

This is an extremely complicated motor vehicle dealer franchise termination case marked by disputes over what is known in the industry as "dualing," i.e., the acquisition by an automobile franchisee of a franchise of a different manufacturer. This case comes before us on appeal from a series of orders entered by the District Court for the District of New Jersey in a declaratory judgment action arising out of a franchise termination. The plaintiff is General Motors Corporation, Chevrolet Motor Division (GM), the franchisor. In 1998, GM notified the defendant, New AC Chevrolet, Inc. (New AC), a dealer in Jersey City, New Jersey, that its franchise agreement would be terminated. As the basis for its termination decision, GM pointed to New AC's insistence on adding a "dualed" Volkswagen franchise to its dealership business despite GM's repeated objections to such an addition.

In its suit, GM sought a declaration that the proposed termination was in compliance with the parties' dealer

agreement, which forbade the addition of other vehicle lines without GM's prior written authorization; the federal Automobile Dealers Day in Court Act (ADDCA), 15 U.S.C. SS 1221-25; and New Jersey's Franchise Practices Act (NJFPA), N.J. Stat. Ann. SS 56:10-1 to 56:10-15. In its response, New AC asserted that the planned termination was actually part of GM's predetermined design to remove New AC as a Chevrolet franchisee, and to have another dealer serve as its exclusive Chevrolet distributor in Jersey City. Consequently, New AC filed a counterclaim, alleging essentially that GM's decision to terminate New AC's franchise, as well certain other of its actions toward New AC, ran afoul of the expressed and implied terms of the franchise agreement, the ADDCA, and the NJFPA.

Although New AC's appeal takes issue with the entire series of orders entered by the District Court during the two-year course of this litigation, New AC's most significant challenges are made in connection with two orders--the January 13, 1999 order dismissing inter alia Counts One and Four of New AC's counterclaim on Fed. R. Civ. Pro. 12(b)(6) grounds, and the March 8, 2000 order granting summary judgment in GM's favor on the ADDCA, NJFPA, and state contract law claims, see General Motors Corp. v. New A.C. Chevrolet, Inc., 91 F. Supp. 2d 733 (D.N.J. 2000). We first take up New AC's challenge to the March 8, 2000 summary judgment order, for the issues raised in connection with this challenge bear directly on the core of the dispute between GM and New AC, and require us to examine the nature of the relationship between an automobile franchisor and franchisee. In pertinent part, the March 8, 2000 order determined: (1) that there was no genuine issue that New AC committed a material breach of the franchise agreement by insisting on the operation of a Volkswagen vehicle line on its dealership premises; and (2) that GM possessed the "good cause" necessary for a lawful franchise termination under S 56:10-5 of the NJFPA. See id. at 738-39, 740-41.

With respect to New AC's challenges to the March 8, 2000 order, we first reject New AC's contention, stressed at oral argument, that its addition of a Volkswagen line did not constitute a breach of its franchise agreement with GM

3

because Volkswagen sales and service were offered at a separate dealership location and facility. We do not think the facts of this case support such a contention. We further conclude that there is no genuine issue as to the materiality of this breach. A breach is material if it will deprive the injured party of the benefit that is justifiably expected under the contract, and, in this case, GM's justifiable expectation is best evidenced by the mutually agreed upon provisions of the dealer agreement that proscribe New AC from offering a "dualed" vehicle line without GM's prior written authorization.

The most significant challenge that New AC raises in connection with its appeal of the March 8, 2000 summary judgment order, a contention also heavily emphasized at oral argument, concerns S 56:10-5 of the NJFPA. As noted above, this statutory provision supplements all private franchise agreements in New Jersey by directing that termination occur only if the franchisor possesses "good cause." N.J. Stat. Ann. S 56:10-5. It defines "good cause" as "failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." Id. Although S 56:10-5, by its terms, appears to define "good cause" only by reference to the actions of the franchisee, New AC argues that the franchisor must also act in good faith in order to possess the "good cause" necessary for termination under S 56:10-5. Because the District Court, in its March 8, 2000 opinion, took the (contrary) position that a franchisor's good faith was irrelevant to the "good cause" inquiry, see General Motors Corp., 91 F. Supp. 2d at 740 n.10, New AC submits that the Court's decision should be reversed.

We assume arguendo, as New AC would like us to do, that under New Jersey franchise law, a franchisor's motivation in effecting a franchisee's termination is relevant to the "good cause" inquiry. Put another way, we assume that a franchisor will not possess the "good cause" required for termination by S 56:10-5 unless it also makes that decision in good faith. Nonetheless, we conclude that New AC has failed to furnish the record evidence necessary to create a genuine issue that GM acted in bad faith (or with an improper motive) in terminating New AC's Chevrolet franchise.

4

New AC's argument for GM's bad faith centers primarily on what we will call the "Project 2000" or "Plan 2000" theory; the central aspect of this theory is the contention that GM's decision to terminate New AC, ostensibly for its "dualing" of a Volkswagen line, was part of its predetermined decision to strip New AC of its Chevrolet franchise, and to have another dealer serve as GM's exclusive Chevrolet franchisee in Jersey City. Examining the record evidence put forth by New AC in support of the "Project 2000" theory, we do not think it suffices to create a genuine issue as to GM's bad-faith motivation. Because we conclude that New AC's "dualing" of a Volkswagen franchise constituted a material breach of its dealer agreement (and represented substantial noncompliance with its franchise obligations), and because we find that New AC failed to create a genuine issue as to GM's bad faith, we will affirm the District Court's March 8, 2000 order in all respects.

We then turn to New AC's challenges to the January 13, 1999 dismissal order, which primarily require us to construe the allegations that New AC set forth in its counterclaim. Here, New AC's first objection is to the District Court's dismissal of Count One of its counterclaim, which alleges that GM violated the provisions of the ADDCA. The ADDCA is a federal remedial statute, enacted to redress the bargaining disparity between large automobile manufacturers and local dealerships. The ADDCA generally requires a manufacturer to act in "good faith" in its relations with its dealers, see 15 U.S.C. S 1222, and defines "good faith" narrowly as precluding "coercion, intimidation, or threats of coercion or intimidation," id. at S 1221(e).

In reviewing the District Court's Fed. R. Civ. Pro. 12(b)(6) dismissal of New AC's ADDCA counterclaim, we begin by clarifying the type of automobile manufacturer conduct that constitutes coercion or intimidation. We have previously stated that the type of coercion or intimidation rendered actionable by the ADDCA occurs only when the manufacturer makes a "wrongful demand which will result in sanction if not complied with." Buono Sales, Inc. v. Chrysler Motors Corp., 449 F.2d 715, 724 (3d Cir. 1971)

5

(internal quotations and citations omitted). We now explain that while a manufacturer does not make a wrongful demand if it merely insists that the dealer comply with a reasonable obligation imposed by the franchise agreement, a dealer can state a claim for relief under the ADDCA by alleging that the manufacturer's reliance on those objectively reasonable provisions is, in fact, motivated by a pretextual, bad-faith reason.

Applying this standard to the facts as alleged in New AC's counterclaim, we conclude that New AC adequately stated a claim for relief under the ADDCA based on GM's approval of the relocation of a competing Chevrolet franchisee, and its decision to terminate New AC due to the latter's "dualing" of a Volkswagen line. However, we do not think that our conclusion necessitates setting aside the District Court's dismissal of Count One of New AC's counterclaim, as New AC was not prejudiced by the District Court's erroneous dismissal of these claims. New AC had a full and fair opportunity to discover and present evidence supporting these claims to the District Court, either because GM's declaratory judgment action presented a mirror image of the claim which remained alive in the litigation and was ultimately adjudicated by the District Court, or because the claim was inextricably linked to New AC's "Project 2000" theory of bad faith, with respect to which New AC's record evidence failed to create a genuine issue of material fact.

New AC also contests the District Court's dismissal of Count Four of its counterclaim, which alleges inter alia that GM's actions violated the implied duty of good faith and fair dealing by predetermining the outcome of its management review process, and by approving the relocation of a competing Chevrolet franchisee. Examining the pertinent allegations made in New AC's counterclaim, we first conclude that New AC failed to make the factual allegations necessary to support a claim that such an implied duty was breached when GM predetermined the outcome of its management review process. We then turn to the more significant question of whether such a duty of good faith even arises under Michigan law--the state law that the parties agree is applicable to the resolution of this issue--in

6

connection with GM's decision to authorize the relocation of a competing Chevrolet franchisee.

Under Michigan state contract law, "[w]here a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." Burkhardt v. City Nat'l Bank of Detroit, 226 N.W.2d 678, 680 (Mich. Ct. App. 1975). We conclude that the pertinent franchise agreement provision, which commits such a relocation decision to the sole discretion of GM, gives rise to an implied duty of good faith. Nonetheless, we believe that the District Court's decision to the contrary does not mandate reversal of the District Court's 12(b)(6) dismissal, as New AC had a full and fair opportunity to obtain and present evidence establishing GM's bad faith but failed to do so adequately.

Aside from these principal issues, New AC brings a series of less significant challenges to the other orders entered by the District Court during the life span of this litigation. We resolve these issues summarily, with brief commentary, infra at note 25, and hold that none warrant reversal of any of the District Court's orders. We thus affirm the decision of the District Court in all respects.

I.

A. Factual Background

New AC is a New Jersey corporation operating as an automobile dealer in Jersey City. GM is a Delaware corporation engaged in the manufacture and distribution of automobiles and automobile parts and accessories. Chevrolet is a division of GM. New AC commenced business as a Chevrolet franchisee in 1983. New AC's dealership was then, and continues to be today, located at 3085 Kennedy Boulevard in Jersey City. The present litigation is not the first between GM and New AC; the two companies earlier sparred over the relocation of a competing Chevrolet franchise, the DiFeo Chevrolet dealership (DiFeo). Because the events surrounding DiFeo's relocation are relevant to certain issues on this appeal, we set forth the key facts.

In 1992, New AC and Bell Chevrolet were the only two Chevrolet franchises located in Jersey City, and both had dealerships situated along Kennedy Boulevard. In November of 1992, DiFeo acquired Bell Chevrolet (one month later, DiFeo itself was acquired by United Auto Group, although it continued to operate under the DiFeo name), and moved the dealership to Clendenny Avenue. In 1995, DiFeo sought to relocate its Chevrolet franchise yet again, this time to a location on Route 440 in Jersey City, and sought GM's permission for the move. Because Route 440 was apparently a more commercially attractive site, GM approved the relocation, and informed New AC that the DiFeo franchise would be moving to a location on Route 440. Concerned that DiFeo's relocation would damage its dealership business, New AC challenged the move both at the administrative level and before the Superior Court of New Jersey.[1] New AC did not prevail, either in the administrative proceedings or in the Superior Court, see New A.C. Chevrolet, Inc. v. Chevrolet Div. of Gen. Motors Corp., 688 A.2d 116 (N.J. Super. Ct. App. Div. 1997), and DiFeo's 1995 relocation to the Route 440 site was allowed to proceed.

We turn now to the facts of the present litigation. At all relevant times, the franchise relationship between GM and New AC was governed by a series of standardized Chevrolet "Dealer Sales and Service Agreements," which fix the rights and obligations of franchisor GM and franchisee New AC, and are renewable every five years. At the time of GM's termination decision, the operative "Dealer Sales and Service Agreement" was one that had become effective on November 1, 1995 (Dealer Agreement). The specific

_____

1. New AC's challenge was brought pursuant to the New Jersey Motor Vehicle Franchise Act (NJMVFA), N.J. Stat. Ann.SS 56:10-16 to 56:10-25, which provides a protest procedure by which an existing automobile dealer can contest (and eventually enjoin) its franchisor's decision to relocate a new dealer into the same market area, by demonstrating that such a move would be "injurious" to the existing dealer and to the public interest. See id. SS 56:10-18, 56:10-19. Such a protest is heard, in the first instance, by the Motor Vehicle Franchise Committee, but the Committee's final determination can be appealed to the Superior Court of New Jersey.

provisions of the Dealer Agreement will be canvassed in more extensive fashion below, as they become pertinent to the analysis of this appeal. For present purposes, however, the most important provision is Article 4.4.2 of the Dealer Agreement, which requires the franchisee to obtain prior written permission from GM before altering the location or the use of its dealership premises, and identifies the addition of a different vehicle line as an alteration covered by this approval requirement: "No change in location or in the use of Premises, including addition of any other vehicle lines, will be made without Division's [i.e., GM's] prior written authorization."

The events directly leading up to the present litigation commenced when New AC decided to supplement its then-existing dealership business by adding a Volkswagen line of vehicles. In late December 1995, New AC submitted applications for a franchise to Volkwagen of America, Inc. (Volkswagen). Volkswagen approved New AC's request, and on February 23, 1996, New AC signed a letter of intent with Volkswagen agreeing to serve as an authorized Volkswagen dealer in Jersey City.

About five weeks after executing the letter of intent, New AC first informed GM, by letter, of its plans to operate a Volkswagen franchise as part of its dealership business. In response, GM requested that New AC supply further information concerning the planned Volkswagen franchise, and submit a proposed Location and Premises Addendum which would identify the space at New AC's Kennedy Boulevard dealership that would be allocated to GM uses and the space that would allocated to Volkswagen uses. Furthermore, GM specifically reminded New AC that Article 4.4.2 of the Dealer Agreement governs New AC's ability to add new vehicle lines to its dealership business.

New AC replied about two weeks later, maintaining that it planned to keep the physical space and personnel devoted to Volkswagen sales and servicing separate and distinct from the space and personnel responsible for GM sales and service. In addition, New AC provided the proposed Location and Premises Addendum. The proposed Addendum represented that the total space at the Kennedy Boulevard dealership then-assigned to GM use would be

9

decreased by 1,000 square feet, which would be re-allocated to Volkswagen use. After reviewing the materials furnished by New AC, GM denied New AC's request for the addition of a Volkswagen line of vehicles. By way of explanation, GM noted that its dealer strategy "generally disfavors dualing of GM lines with the vehicle lines of another manufacturer;" it also identified New AC's deficiencies as a dealer in four areas: capitalization, sales performance, customer satisfaction, and training, and stated GM's concern that the addition of a Volkswagen line would exacerbate these deficiencies.

New AC reacted to this denial by asking for non-binding management review of the decision, in accordance with GM's internal grievance procedure, as detailed in the GM handbook entitled "Dispute Resolution Process for Chevrolet, Pontiac, Oldsmobile or GMC Truck Dealers." GM conducted the requested management review, but informed New AC that its denial of the Volkswagen line addition would stand. New AC then asked GM to reconsider and represented that it had improved the deficiencies in its capitalization, sales performance, customer satisfaction, and training that GM had earlier observed. Again, GM stood by its denial, stressing its general policy against"dualing of GM lines with those of another manufacturer." Again, GM pointed New AC to its obligations under Article 4.4.2 of the Dealer Agreement, stating: "[P]lease be reminded that any change to, or in the use of, a dealer's facility requires the prior written approval of the division."

Despite GM's denials, New AC proceeded with its plans to add a Volkswagen line of vehicles at the Kennedy Boulevard dealership. GM officials learned that New AC had begun operating a Volkswagen franchise around January 1997. On January 15, 1997, Daniel Durkin, GM's Zone Manager for the area including Jersey City, wrote to New AC informing the franchisee that it was in material breach of the Dealer Agreement due to its "addition of the Volkswagen franchise without obtaining General Motors written approval," as required under Article 4.4.2 of the Dealer Agreement. Durkin warned New AC that "if this serious situation is not satisfactorily resolved or corrected within 30 days from your receipt of this letter, then

10

Chevrolet Motor Division may elect to terminate the Dealer Agreement and cease all business relationships with your dealer company." Durkin sent a second letter of warning to New AC about one month later, on February 11, 1997, stressing that "[t]he only rectification acceptable to Chevrolet is for The New A.C. Chevrolet to remove Volkswagen from the Chevrolet premises, which can be accomplished by providing completely separate sales and service facilities for Volkswagen."

GM's interactions with New AC during this period were not, however, limited to the sending of warning letters. Around June of 1997, in an apparent attempt to arrive at a mutually satisfactory compromise avoiding the termination of New AC's Chevrolet dealership, Durkin suggested that New AC consider offering Oldsmobiles, manufactured by another GM division, as a second line of vehicles at the Kennedy Boulevard location. According to Durkin, the DiFeo dealership, the other Chevrolet franchisee operating in Jersey City, was in the process of relinquishing both its Chevrolet and Oldsmobile franchises. Durkin recommended that New AC explore the possibility of acquiring the soon-to-be relinquished Oldsmobile franchise, and indicated that GM would support the addition of Oldsmobile to New AC's dealership under the appropriate circumstances. Durkin mentioned that GM hoped for a dealership presence around Route 440, a more centralized commercial location in Jersey City, and that, to that end, GM was pursuing a lease option on property in the Route 440 vicinity. Durkin suggested that GM would be willing to offer financial support to New AC to develop the Route 440 property as a satellite location for a "dualed" Chevrolet/Oldsmobile dealership, or to convert New AC's existing Kennedy Boulevard facility into one better suited for the sale and service of "dualed" Chevrolet and Oldsmobile lines.

Although GM offered this compromise, it remained steadfast in its insistence that New AC abandon its Volkswagen franchise. At the same time that Durkin suggested that GM would support the addition of an Oldsmobile line, he made clear to New AC that the continuation of the Volkswagen franchise was not a

11

workable option: "Under any circumstances, whether or not you choose to pursue the opportunities outlined above, the continued unauthorized presence of Volkswagen at your current location remains an unacceptable violation of your Dealer Sales and Service Agreement." In addition, throughout the summer and fall of 1997, GM repeatedly sent letters to New AC reiterating that New AC's continued operation of the Volkswagen franchise was in violation of the Dealer Agreement.

Throughout the summer and fall of 1997, New AC and GM explored the viability of the proposed Oldsmobile compromise. GM investigated the possibility of leasing various sites along the Route 440 corridor, and repeatedly extended the deadline for New AC to accept or reject the Oldsmobile compromise. Ultimately, this proposed plan fell through when GM informed New AC that it was unable to complete leasing arrangements for the Route 440 sites it had contemplated, and when New AC responded by insisting that it would not discontinue its Volkswagen franchise. New AC contended that it had adequately addressed GM's concerns about the "dualing" of Chevrolet and Volkswagen lines at the Kennedy Boulevard dealership by constructing a separate showroom and using a separate staff for the Volkswagen vehicles, and by working toward creating a separate Volkswagen parts and service facility.

Finally, in January of 1998, about eighteen months after New AC first informed GM of its intention to obtain and operate a Volkswagen franchise at the Kennedy Boulevard dealership, GM terminated New AC's Chevrolet franchise. In a letter dated January 5, 1998, Daniel Durkin observed that New AC, by maintaining a Volkswagen line, "has been in continual violation" of provisions of the Dealer Agreement. Specifically, Durkin asserted that New AC was in violation of Article 4.4.2 of the agreement, which, as noted above, provides that "[n]o change in location or in the use of Premises, including addition of any other vehicle lines, will be made without [GM's] prior written authorization." Durkin also relied on Article 13.1.5 of the Dealer Agreement, which identifies the following franchisee conduct as a material breach of the agreement: "Any sale, transfer, relinquishment, or discontinuance of use by [New

12

AC] of any of the Dealership Premises or other principal assets required in the conduct of the Dealership Operations, without [GM's] prior written approval." Durkin informed New AC that, because of these material breaches, GM was electing "to terminate the Dealer Sales and Service Agreement and cease all business relationships with The New A.C. Chevrolet Company effective sixty days from. . . receipt of this letter."

B. Procedural History

1. The Pleadings

The present litigation commenced when, on January 5, 1998--the same day on which Durkin informed New AC of its termination as a Chevrolet franchisee--GM filed a complaint in the District Court seeking a declaration that its termination of the New AC franchise was lawful. Count I of GM's complaint requested a declaration that the termination did not constitute a breach of any provision of the Dealer Agreement. Count II requested a declaration that the termination did not violate the federal Automobile Dealers Day in Court Act (ADDCA), 15 U.S.C. SS 1221-25. Count III asked for a declaration that the termination was not in violation of New Jersey's Franchise Practices Act (NJFPA), N.J. Stat. Ann. SS 56:10-1 to 56:10-15.2

_____

2. In its August 26, 1998 order, the District Court granted GM leave to amend this original complaint, to include claims based on New AC's post-termination conduct, particularly New AC's continued display of Chevrolet and GM signage after the revocation of its Chevrolet franchise. In its amended complaint, GM asserted that New AC's use of such signage violated the Lanham Act, 15 U.S.C. S 1051 et seq. (Counts VI and VII); the common law of trademark infringement and unfair competition (Count VIII); and Article 17.5 of the Dealer Agreement (Count IX). Counts I, II, and III of the Amended Complaint rescribed the three counts contained in GM's original complaint, requesting a declaration that New AC's termination did not breach the Dealer Agreement and did not contravene the ADDCA or the NJFPA. GM's amended complaint also contained five counts based on two other post-termination actions allegedly taken by New AC. Because GM eventually consented to the dismissal of all five of these counts, in connection with the District Court's March 8, 2000 order granting GM summary judgment, these claims are not at issue on this appeal.

13

On April 2, 1998, New AC responded by filing a nine-count counterclaim, basically alleging that GM's course of conduct in dealing with New AC violated the express and implied terms of the Dealer Agreement, as well as the ADDCA, and the NJFPA. (The specific allegations made in particular counts will be set forth below, as they become relevant to our analysis.) In terms of relief, New AC requested $25 million in compensatory damages plus additional punitive damages on each of the first eight counts, and an injunction preventing GM from terminating New AC's Chevrolet franchise and ordering GM to allow New AC to operate a Volkswagen franchise.

2. The Principal Orders

Although New AC's appeal challenges a series of orders entered by the District Court during the two-year course of this litigation, New AC's most significant contentions arise in connection with only two, the January 13, 1999 order partially granting GM's motion to dismiss seven of the nine counts of New AC's counterclaim, and the March 8, 2000 order granting GM summary judgment, see General Motors Corp. v. New A.C. Chevrolet, Inc., 91 F. Supp. 2d 733 (D.N.J. 2000). We summarize these two orders here; we will discuss the details of the remaining challenged orders below (particularly infra in note 25), as they become pertinent to our analysis.

GM filed a motion to dismiss seven of the nine counts in New AC's counterclaim, which the District Court granted in an order and accompanying opinion entered on January 13, 1999. On this appeal, New AC only challenges the District Court's dismissal of Counts One and Four. In Count One, New AC alleged that GM violated the ADDCA by engaging in a course of wrongful conduct that rose to the level of coercion and intimidation. The District Court disagreed, concluding that the coercion and intimidation alleged by New AC did not constitute the type of coercion and intimidation required for an ADDCA violation.

In Count Four, New AC alleged that GM breached the express and implied terms of the Dealer Agreement by allowing the DiFeo Chevrolet franchise to relocate, and by

14

"refusing to comply with its self-imposed mediation process." The District Court decided that the contentions contained in Count Four failed to state a claim, on the grounds that the counterclaim failed to allege any facts indicating that New AC was denied an opportunity to participate in private mediation, or that GM acted in bad faith in permitting the DiFeo relocation.

Following the Court's January 13, 1999 order dismissing seven of the nine counts contained in the counterclaim, only Counts Two and Three, both asserting that GM violated the NJFPA, remained alive. Count Two alleged that GM had violated S 56:10-5 of the NJFPA, prohibiting the termination of motor vehicle dealers without "good cause." Count Three alleged that GM had violated S 56:10-7(e) of the NJFPA, barring the imposition of unreasonable standards of performance on automobile dealers, by imposing unreasonable restrictions on New AC. New AC and GM proceeded to discovery on Counts Two and Three of New AC's counterclaim, as well as on all of the claims set forth in GM's amended complaint.

After the conclusion of discovery, GM moved for summary judgment, see Fed. R. Civ. Pro. 56, on the portions of its amended complaint alleging that New AC's franchise termination was lawful (Counts I, II, and III) and that New AC's post-termination use of GM signage was unlawful (Counts VI, VII, VIII, and IX). GM also sought summary judgment against New AC on Counts Two and Three of the counterclaim just described. New AC cross-moved for summary judgment with respect to GM's entire amended complaint.

In its March 8, 2000 order and accompanying opinion, the District Court resolved the summary judgment motions in GM's favor. See General Motors Corp., 91 F. Supp. 2d at 734. With respect to Count I of the amended complaint, which seeks a declaration that New AC's termination was in accord with the provisions of the Dealer Agreement, the Court concluded that the plain language of the agreement clearly gave GM the authority to end New AC's franchise based on New AC's addition of a Volkswagen line over GM's express objection. See id. at 738-39. With respect to Count II of the amended complaint, which seeks a declaration that

15

the termination was proper under the ADDCA, the Court observed that New AC had failed to furnish any factual support for the claim that GM's conduct amounted to coercion or intimidation. See id. at 739–40. Finally, with respect to Count III of the amended complaint and Counts Two and Three of New AC's counterclaim, which focus on the NJFPA, the Court found that New AC's unauthorized addition of a Volkswagen line constituted "good cause" for termination as that term is defined in the NJFPA, and further concluded that New AC had failed to present any evidence that the performance standards imposed by GM on New AC were unreasonable. See id. at 740–41.

The District Court's March 8, 2000 order also granted summary judgment for GM on Counts VI, VII, VIII, and IX, the sections of GM's amended complaint contending that New AC's continued post-termination display of GM signage violated federal and state trademark and unfair competition law, and breached the terms of the Dealer Agreement. See id. at 741–43. Although adjudicating New AC liable for trademark infringement, the March 8, 2000 order did not set the amount of GM's damages. Rather, the District Court directed the parties to submit additional briefs regarding the proper measure of damages, the amount of time New AC was to be granted for removal of the GM signage, and whether New AC was entitled to compensation for the signage under the NJFPA. See id. at 743.

New AC timely appealed the March 8, 2000 order (and a subsequent April 5, 2000 order awarding GM relief) to this Court. The District Court had federal question jurisdiction over the ADDCA and Lanham Act claims under 28 U.S.C. S 1331, and diversity jurisdiction over the state common law and statutory claims under 28 U.S.C. S 1332. For the reasons set forth in the margin, notwithstanding GM's objections, we have appellate jurisdiction under 28 U.S.C. S 1291 over all of the orders challenged by New AC.3

_____

3. In its notice of appeal, New AC relates that it is appealing from the District Court's March 8, 2000 order granting GM summary judgment and its April 5, 2000 order awarding GM relief. In the March 8, 2000 order, the District Court adjudicated all of the open liability issues in the litigation, determining that GM was not to be held liable for its

16

II. The March 8, 2000 Order

We first take up New AC's challenges to the District
Court's March 8, 2000 order, which finally adjudicated

_____

termination of New AC's Chevrolet franchise, and that New AC was
responsible for its post-termination use of GM's trademarks. The April 5,
2000 order further specified the relief that GM was to receive: the
District Court entered a permanent injunction against New AC,
prohibiting its continued use of GM's marks; granted GM attorneys fees
in the amount of $15,940.32; and awarded GM damages in the amount
of "10% of defendant's [i.e., New AC's] profits, trebled; profits to be
measured from May 20, 1998, through the date of this Order [i.e., April
5, 2000]." The April 5, 2000 order, however, did not reduce the amount
of these damages to a sum certain.

Prior to the filing of the appellate briefs, GM moved to dismiss the
appeal, contending that the District Court's order was not final for
purposes of 28 U.S.C. S 1291, and this motion has been pending before
us. Were our finality determination to be based solely on the face of the
March 8, 2000 and April 5, 2000 orders, we would be constrained to
conclude that the orders were not final under S 1291. Section 1291 of
Title 28 authorizes appellate jurisdiction over inter alia "all final
decisions of the district courts of the United States." 28 U.S.C. S 1291.
A final order is one that "ends the litigation on the merits and leaves
nothing for the court to do but execute the judgment." Catlin v. United
States, 324 U.S. 229, 233 (1945).

In general terms, a decision that fixes the parties' liability but leaves
damages unspecified is not final, and the adjudication of liability is not
immediately appealable. See United States v. Schaefer Brewing Co., 356
U.S. 227, 233-34 (1958); Sun Shipbuilding & Dry Dock Co. v. Benefits
Review Bd., 535 F.2d 758, 760 (3d Cir. 1986) (per curiam). Although the
District Court's April 5, 2000 order set forth a reasonably precise
formula for the determination of damages (i.e., 10% of net profits during
a specified period of time), so that one could characterize the
unperformed damage calculation as a merely mechanical or ministerial
act that would not preclude our exercise of appellate jurisdiction, see
Parks v. Pavkovic, 753 F.2d 1397, 1402 (7th Cir. 1985) (determining that
S 1291 finality exists when "computing the money owed . . . is unlikely
to engender dispute or controversy, and will require no analytic or
judgmental determinations that might . . . give rise to other appealable
questions"), our precedent squarely forecloses us from doing so. See
Marshak v. Treadwell, 240 F.3d 184, 191 (3d Cir. 2001) (holding that an
order awarding the defendants damages for trademark infringement in
the amount of "the profits [plaintiff] earned in each year, beginning with

17

GM's liability for the termination of New AC's Chevrolet
franchise, granting summary judgment in GM's favor. See
_____

the first act of infringement in 1970 and ending with the first day of
trial
testimony in this case" was not final because the damage calculation
"cannot reasonably be characterized as merely ministerial. . . . [T]he
parties here have a long history of contentious litigation, and there is a
substantial likelihood that `one or both parties will dispute the ultimate
amount of damages awarded . . . .' "); Apex Fountain Sales, Inc. v.
Kleinfeld, 27 F.3d 931, 934, 936 (3d Cir. 1994) (holding that a civil
contempt order directing that an accounting be performed to determine
the net profit the plaintiff would have realized absent the defendant's
contemptuous conduct was not final, because "no judgment containing
a final dollar amount ha[d] been entered" and because the factual
determination of net profit "will not be easily reached").

In the instant matter, however, the analysis of our appellate
jurisdiction is not limited by the face of the March 8, 2000 and April 5,
2000 orders, as subsequent, post-appeal proceedings bear directly on
our S 1291 finality calculus. See Aluminum Co. of America v. Beazer East,
Inc., 124 F.3d 551, 557 (3d Cir. 1997) ("Even if the appeals court would
have lacked jurisdiction at the time an appeal was filed, the court has
jurisdiction if, as a result of subsequent events, there are no longer any
claims left to be resolved by the district court."). Following the
District
Court's April 5, 2000 order, the only claims left to be resolved were the
application of the damage formula and the reduction of damages to a
sum certain. During the pendency of this appeal before this Court, the
District Court actively managed the matter in order to arrive at a precise
damage figure. On November 8, 2000, the Magistrate Judge submitted a
report and recommendation fixing the damages New AC owed to GM not
only under the April 5, 2000 order, but also under a subsequent May 11,
2000 order holding New AC in civil contempt for failing to comply with
the April 5, 2000 directive to cease use of GM's trademarks. The final
figure, covering all of the damages and attorneys fees awarded to GM,
was set at $324,644.52. The parties filed no objections to the report and
recommendation, and the District Court approved the Magistrate Judge's
report on December 12, 2000. In that December 12, 2000 order, the
District Court also entered a final judgment against New AC for the
$324,644.52 damage amount, and neither New AC nor GM noticed an
appeal. It is clear that this order adjudicated all of the unresolved
issues
then-pending before the court, and we thus conclude that these post-
appeal adjudications suffice to render New AC's appeal from the March
8, 2000 and April 5, 2000 orders final for S 1291 purposes. GM's motion
to dismiss the appeal is therefore denied.

There is one final issue presented regarding the scope of our appellate
jurisdiction. New AC's appeal presents challenges not only to the March

General Motors Corp. v. New A.C. Chevrolet, Inc., 91 F.
Supp. 2d 733, 734 (D.N.J. 2000). Our review of a grant or
denial of summary judgment is plenary. See Mathews v.
Lancaster Gen. Hosp., 87 F.3d 624, 632 (3d Cir. 1996). We
may uphold the grant of summary judgment only if, like the
District Court, we determine that there are no genuine
issues of material fact and the movant is entitled to
summary judgment as a matter of law. See Tice v. Centre
Area Transp. Auth., 247 F.3d 506, 511 n.2 (3d Cir. 2001).
In making this determination, we view the facts in the light
most favorable to the non-moving party. See id.

Although New AC's briefing falls far short of analytical
clarity, it appears that New AC raises three basic,
alternative grounds for reversal of the District Court's
March 8, 2000 disposition. First, New AC appears to
contend that there is a genuine issue as to whether a
breach of the Dealer Agreement occurred at all (and hence
whether GM had "good cause" for termination), since, in
New AC's submission, the terms of the franchise agreement
did not prohibit its specific "dualing" of a separate
Volkswagen line. Second, New AC offers the alternative

_____

8, 2000 and April 5, 2000 orders identified in New AC's notice of appeal,
but also to a series of non-final orders entered earlier in the
litigation.
Specifically, New AC contests (1) a May 15, 1998 order denying New AC
a preliminary injunction; (2) an August 26, 1998 order denying New AC's
motion to dismiss; (3) a January 13, 1999 order partially granting GM's
motion to dismiss; (4) orders entered on March 8, 1999 and April 28,
1999 by the Magistrate Judge that limited the scope of New AC's
discovery; and (5) an order entered on August 4, 1999 denying New AC's
motion for disqualification of the District Judge originally assigned to
the
case and vacatur of all orders entered by that Judge. Generally, we
construe notices of appeal liberally and, therefore, we review earlier
non-
final orders not specified in the notice of appeal where (1) there is a
connection between the specified and unspecified order; (2) the intention
to appeal the unspecified order is apparent; and (3) the opposing party
is not prejudiced and has a full opportunity to brief the issues. See
Pacitti v. Macy's, 193 F.3d 766, 777 (3d Cir. 1999). Because we find that
all of these elements are clearly satisfied in this case, we conclude that
the scope of our appellate jurisdiction encompasses all of the prior non-
final orders, unspecified in the notice of appeal, to which New AC
currently raises challenges.

19

argument that, even if its addition of a Volkswagen franchise did represent a breach of the terms of the Dealer Agreement, the "dualing" was not sufficiently egregious to justify New AC's franchise termination, i.e., the breach was not material. Finally, New AC contends, in essence, that even if the District Court was correct in determining that New AC did not substantially comply with the Dealer Agreement by insisting on the addition of a Volkswagen line, reversal of the summary judgment grant on the NJFPA claims is warranted because the Court erred in concluding that GM's motivation for terminating the franchise--i.e., GM's good faith or lack thereof--was irrelevant to the question whether GM had "good cause" for New AC's termination as a Chevrolet dealer.

A. Breach

New AC's first major contention with respect to the District Court's summary judgment grant in the March 8, 2000 order is with the conclusion that a breach of the Dealer Agreement occurred at all. In New AC's submission, the terms of the Dealer Agreement never prohibited the addition of a Volkswagen franchise at a separate dealership site, and thus, GM's permission was never required for the Volkswagen addition. In New AC's view, GM was powerless to object to the addition because New AC did not employ any of the space it had previously dedicated to GM use to later sell and service Volkswagen automobiles. This is what the District Court, in its prior May 15, 1998 opinion, referred to as the "different premises" /"different businesses" theory. In essence, New AC contends that there is a genuine issue as to whether it breached the terms of the franchise agreement at all, and that the District Court erred in deciding otherwise. We disagree.

The "different premises" / "different business" line of argument rests heavily on an interpretation of New AC's obligations under the Dealer Agreement with respect to its dealership facilities. The key word on which New AC focuses is the term "premises," which appears in both Articles 4.4.2 and 13.1.5 of the Dealer Agreement, the provisions that GM claims New AC materially breached by insisting on the addition of a Volkswagen line of vehicles.

20

Specifically, Article 4.4.2 states in relevant part that "[n]o change in location or in the use of Premises, including addition of any other vehicle lines, will be made without [GM's] prior written authorization." (emphasis added). Article 13.1.5 includes in the list of dealer actions that constitute material breaches of the Agreement, "[a]ny sale, transfer, relinquishment, or discontinuance of use by Dealer of any of the Dealership Premises or other principal assets required in the conduct of the Dealership Operations, without [GM's] prior written approval." (emphasis added).

New AC asserts that the term "premises" should be read narrowly to cover only the physical facilities accompanying the 3085 Kennedy Boulevard address. According to New AC, the Volkswagen showroom is located at a site adjacent to and physically distinct from the facilities at 3085 Kennedy Boulevard, a site assigned the address of 3081 Kennedy Boulevard. Moreover, New AC submits that, at least as of 1998, it was close to setting up a separate parts and service area for the Volkswagen vehicles, and informed GM that it would use different staffs to sell and service its Chevrolet and Volkswagen automobiles. Thus, New AC's argument goes, the Volkswagen site is separate and distinct from the New AC dealership's "premises," and the site's use by New AC for Volkswagen purposes does not represent a change in the location or use of New AC's "premises" within the meaning of Article 4.4.2, or a transfer or discontinuance of "premises" use within the meaning of Article 13.1.5.

In granting summary judgment to GM on Count I of its amended complaint, the District Court dismissed New AC's "different premises" / "different business" theory in a footnote:

> This Court rejects New A.C.'s effort to redefine the term "Premises" to avoid the clear meaning of this contractual provision. The "Premises" is clearly the dealership property being operated as an exclusive Chevrolet franchise as defined in the Location and Premises Addendum to General Motors Corporation Dealer Sales and Service Agreement . . . . GM's decision to denominate minimum requirements

governing the display of Chevrolet vehicles, et cetera,
does not alter the fact that the "Premises" included all
dealership property located at 3085 Kennedy
Boulevard, Jersey City, New Jersey.

General Motors Corp., 91 F. Supp. 2d at 739 n.9. On
appeal, New AC takes issue with the District Court's
conclusion, claiming that the District Court's interpretation
of the term "premises" as used in the Dealer Agreement is
incorrect.

According to New AC, a correct interpretation of the term
must start with Article 4.4.1, which states: "Dealer agrees
to conduct Dealership Operations only from the approved
location(s) within its Area of Primary Responsibility. The
Location and Premises Addendum identifies Dealer's
approved location(s) and facilities ("Premises")." New AC
asserts that the terms "location" and "facilities" are
conceptually separate; i.e. that "location" refers to the street
address of the dealership (3085 Kennedy Boulevard) while
the term "facilities" refers to the square footage
designations made in the Location and Premises
Addendum. (Under the terms of the franchise relationship,
New AC is obligated to submit such an Addendum, which
lists the various dealer locations, and contains a "premises
space analysis" showing the manner in which the dealer's
different departments allocate stalls and square footage
between GM and non-GM uses.) Furthermore, New AC
asserts, the term "premises" covers only the dealer's
"facilities" and not its "location." Thus, New AC's argument
goes, the District Court erred by concluding that the term
"premises" covered all dealership property at 3085 Kennedy
Boulevard, rather than just the stall and square footage
designations listed in the Location and Premises
Addendum.

Like the District Court, we are dubious of New AC's
Addendum-only construction of the term "premises."
However, we need not decide whether this construction is
the appropriate one. We believe that New AC's argument
loses on its own terms because, even accepting arguendo
New AC's assertion that "premises" covers only the stall and
square footage designations listed in the Location and
Premises Addendum, the Addenda in the record before us

22

indisputably demonstrate that at least a portion of the "facilities" (and hence "premises") originally allocated to GM use at 3085 Kennedy Boulevard would be (and presumably were) converted to Volkswagen use with the addition of the Volkswagen line.

In the 1990 Location and Premises Addendum for 3085 Kennedy Boulevard, furnished to GM prior to New AC's request for the Volkswagen addition, all of the space was allocated to GM use. Conversely, the proposed 1996 Addendum, which New AC supplied at GM's request once New AC asked for permission to add a Volkswagen line to its dealership, clearly indicates that some of the space originally dedicated to GM use would be shifted to the Volkswagen line. For instance, 100 square feet of general office space and 900 square feet of part storage space would be converted to Volkswagen use, as would four mechanical service bays.4 Accordingly, even were we inclined to follow New AC's suggestion to construe "premises" narrowly to include only the space allocations contained in the Location and Premises Addenda, those Addenda demonstrate that at least some portion of the "premises" at 3085 Kennedy Boulevard were transferred from GM to Volkswagen use. Thus, the space-designation-only argument offers New AC no assistance, and we conclude that New AC breached Articles 4.4.2 and 13.1.5 of the Dealer Agreement.

_____

4. At various times, New AC indicated to GM that it would eventually move the Volkswagen service and parts storage facilities to a separate, physically distinct space. The record does not indicate whether this was eventually accomplished. The record does show that, at least as of May 14, 1998, over four months after GM informed New AC that its Chevrolet franchise was terminated and six days before the termination was formally implemented, New AC was continuing to devote four service bays and part of the small parts department at the 3085 Kennedy Boulevard location to Volkswagen use. At all events, the dispositive question here is whether New AC was in material breach of the Dealer Agreement as of the time GM decided to terminate the Dealer Agreement, thereby furnishing GM with a justifiable ground for termination, rather than whether such a breach continued to exist at some point thereafter.

23

B. Materiality

As an alternative challenge to the District Court's March 8, 2000 grant of summary judgment, New AC submits that its addition of a Volkswagen franchise over GM's express and repeated objections, even if considered a breach of the Dealer Agreement, was not egregious enough to warrant severance of the franchise relationship. New AC's argument here is that any breach that it committed was not a material one, and thus did not justify termination of the franchise contract.5 We disagree, concluding that, on the record before us, there is no genuine issue that New AC's Volkswagen addition constituted a material breach.

Materiality goes to the essence of the contract; a breach is material if it "will deprive the injured party of the benefit that is justifiably expected" under the contract. 2 E. Allan Farnsworth, Farnsworth on Contracts S 8.16, at 497 (2d ed. 1998). We think there can be no dispute that New AC's insistence on adding a Volkswagen franchise to its dealership, contrary to GM's repeated objections to this decision, rose to the level of material breach. GM's justifiable expectations regarding New AC's performance under the franchise agreement are best evidenced by the provisions of the Dealer Agreement. In Article 13.1, the parties to the Dealer Agreement explicitly defined certain acts or events as constituting material breaches of the contract. Article 13.1.5 specifically includes as a material breach, "[a]ny sale, transfer, relinquishment, or discontinuance of use by Dealer of any of the Dealership Premises or other principal assets required in the conduct of the Dealership Operations, without [GM's] prior written approval."

To similar effect is Article 4.4.2, which directly governs situations in which a dealer seeks to add another vehicle franchise: "No change in location or in the use of Premises,

_____

5. It is hornbook law that when one party to a contract commits a material breach, the non-breacher has the option of either continuing the contract and suing for partial breach, or terminating the agreement in its entirety. See 2 E. Allan Farnsworth, Farnsworth on Contracts S 8.16, at 495 (2d ed. 1998). In the case of a non-material breach, the termination option is not open to the non-breacher. See id. at 495-96.

24

including addition of any other vehicle lines, will be made without [GM]'s prior written authorization."6 In light of our discussion supra in Part II.A regarding New AC's "different premises" / "different business" theory, it is clear that New AC's operation of a Volkswagen franchise and its blatant disregard of GM's objection to that addition violated Articles 13.1.5 and 4.4.2 of the Dealer Agreement, and consequently represented a material breach of the franchise agreement.

To be sure, absent Articles 13.1.5 and 4.4.2, New AC would have the generally unfettered right to put its dealership property to the uses it sees fit, including the operation of an independent and competing vehicle line. See 1 Gladys Glickman, Franchising, S 10.07[7], at 10-72 (2001) ("If the franchisee is the owner or lessee of the premises from which the franchised business is conducted he or she has the right to use the premises for any purpose permitted by the zoning laws and the landlord unless the franchisor, by contract, further restricts the businesses which may be operated on the premises."). In New AC's case, however, the parties mutually agreed to constrain the exercise of that right by conferring on GM the power to disapprove of a proposal to "dual" another vehicle line, a power which GM clearly and consistently employed to deny New AC's request to add a Volkswagen line to its dealership.

Mindful of the disparity in bargaining leverage that can arise between a franchisor and franchisee, we do not suggest that Articles 4.4.2 or 13.1.5, or GM's reliance on those contractual provisions to disapprove of New AC's decision to "dual" a Volkswagen franchise, are unassailable. We think, for instance, that New AC could raise viable

_____

6. Although Article 4.4.2 is not included within Article 13.1's enumerated list of material breaches, Article 13.1.13 makes clear that the list is non-
exhaustive, stating (perhaps tautologically) that"[a]ny other material breach of Dealer's obligations under this Agreement not otherwise identified in this Article 13 or in Article 14" can constitute a material breach. Given the substantial similarity of the obligations imposed by Articles 4.4.2 and 13.1.5 on a franchisee seeking to alter the use of its dealership facilities, we believe that a violation of Article 4.4.2 will typically amount to a material breach of the Dealer Agreement.

25

challenges to those provisions on the ground that such anti-"dualing" provisions in general impose unreasonable obligations on franchisees like New AC, or that GM's reliance on such provisions in New AC's particular case constitutes an unreasonable application of the anti-"dualing" prohibition. In regard to the former contention, New AC has never challenged Articles 4.4.2 or 13.1.5-- either in the District Court, see General Motors Corp., 91 F. Supp. 2d at 739 n.8, or on this appeal--on the ground that such anti-"dualing" proscriptions constitute, as a general matter, unreasonable restrictions on a franchisee's rights.[7]

We assume, therefore, that Articles 4.4.2 and 13.1.5 impose reasonable obligations on franchisees, and conclude that a franchisee's breach of a reasonable franchise obligation--committed over the express and persistent objections of the franchisor--is a material one. Cf. Amerada Hess Corp. v. Quinn, 362 A.2d 1258, 1268-69 (N.J. Super. Ct. Law Div. 1976) ("Plainly, noncompliance by a franchisee with his reasonable franchise obligations, resulting in an actual or potential adverse effect upon the sales of the franchisor's products, would constitute substantial noncompliance thereof for purposes of termination, impairing as it does the franchisor's fundamental reason for initially entering into the relationship."); accord Brattleboro Auto Sales, Inc. v. Subaru of New England, Inc., 633 F.2d 649, 652 (2d Cir. 1980) (upholding a manufacturer's termination of a Subaru dealer under the Vermont franchise practices statute, on the ground that the manufacturer "reasonably could have concluded that [the dealer's] sales and service of Subaru cars would suffer as a result of [the dealer's] simultaneous promotion of several lines of directly competing cars").

New AC, however, does appear to contest the reasonableness of GM's reliance on the anti-"dualing" provisions of the Dealer Agreement in this particular case, attempting to minimize the seriousness of its breach by

_____

7. Instead, New AC focused on arguing that its addition of a Volkswagen line never violated the anti-"dualing" provisions of Articles 13.1.5 or 4.2.2, because Volkswagen-related activities would occur at a separate vehicle site. We rejected this argument supra  in Part II.A.

26

summarily asserting that, because GM permits numerous other dealers to operate additional vehicle lines, New AC's addition of a Volkswagen line over GM's objections could not affect the core of the franchise relationship between GM and New AC, and thus does not rise to the level of a material breach. If the evidence proffered by New AC demonstrated that GM routinely permitted dealers similarly situated to New AC--e.g., in similar geographical areas, with similar competitors and consumer bases--to operate competing vehicle franchises, then such evidence would tend to show that GM arbitrarily withheld its approval of New AC's proposed Volkswagen addition, and could significantly undermine the idea that GM justifiably and reasonably expected its franchisees to offer only single, GM vehicle lines. However, New AC makes no such showing.

While we may judicially notice the existence of multi-line vehicle dealers, New AC points to no record evidence identifying any of the other GM dealers operating multi-line dealerships, or indicating which vehicle lines are offered at those dealerships. More importantly, New AC offers no evidence tending to show that these multi-line dealers are similarly situated to New AC. In sum, based on the record evidence before us, there is no genuine issue as to the fact that New AC's decision to add a Volkswagen franchise despite GM's objection constituted a material breach of the Dealer Agreement.8

_____

8. New AC raises this same basic argument in the context of challenging the District Court's grant of summary judgment on the NJFPA claims, i.e., Count III of GM's amended complaint and Count Two of New AC's counterclaim, framing the contention in slightly different doctrinal terms.
New AC argues that GM did not have the "good cause" necessary to lawfully terminate New AC's Chevrolet franchise in accordance with S 56:10-5 of the NJFPA because New AC never failed to "substantially comply" with its obligations under the franchise agreement. We find New AC's argument here similarly unpersuasive.

First, we believe that our determination as to whether New AC's breach was material under the terms of the franchise agreement resolves the question whether New AC "substantially compl[ied]" with the agreement for purposes of S 56:10-5's "good cause" requirement. N.J. Stat. Ann. S 56:10-5. Put simply, we see no real or practical difference between a conclusion that a party materially breached a contract, and a conclusion

27

C. "Good Cause"

New AC's best argument for reversal of the District
Court's grant of summary judgment for GM concerns the
NJFPA claims. Before the District Court and again on
appeal, New AC argues that, although the NJFPA defines
"good cause" solely as "failure by the franchisee to
substantially comply with those requirements imposed
upon him by the franchise," N.J. Stat. Ann. S 56:10-5, a

_____

that the party failed to substantially comply with its obligations under a
contract. To decide otherwise would be simply to engage in linguistic
games. Cf. Farnsworth, S 8.16, at 496 ("The doctrine of material breach
is simply the converse of the doctrine of substantial performance.
Substantial performance is performance without a material breach, and
a material breach results in performance that is not substantial."); cf.
also Amerada Hess, 362 A.2d at 1266-67 (observing that the well-
established "concept of substantial performance .. . generally utilized in
the realm of building contracts but applied, where appropriate, to other
contractual agreements as well" "has been carried into the franchise
milieu by the `good cause' requirement for termination"--specifically, by
S 56:10-5's substantial non-compliance standard).

At all events, we find New AC's contention unavailing, even leaving
aside our analysis of the materiality of New AC's breach. In asserting
that New AC's conduct in connection with the Volkswagen franchise did
not rise to the level of substantial noncompliance necessary for "good
cause" under the NJFPA, New AC cites for comparison two decisions in
which a franchisee's breach was held to constitute substantial
noncompliance for purposes of S 56:10-5. See Jiffy Lube Int'l, Inc. v.
Weiss Bros., Inc., 834 F. Supp. 683 (D.N.J. 1993); Amerada Hess Corp.
v. Quinn, 362 A.2d 1258 (N.J. Super. Ct. Law Div. 1976). We believe,
however, that New AC's conduct in this case is at least as egregious and
serious as the franchisees' actions in Amerada Hess and Jiffy Lube. Like
the franchisee in Jiffy Lube, New AC deliberately disregarded its
obligations to its franchisor GM, insisting on maintaining a competing
manufacturer's vehicle line even in the face of GM's numerous and
repeated objections. Moreover, like the franchise arrangement in Jiffy
Lube, the Dealer Agreement between GM and New AC made the pertinent
obligations explicit, and authorized GM to terminate the relationship if
those requirements were violated, thereby indicating the integral nature
of those obligations to the franchise relationship. In sum, we conclude
that there is no genuine issue either that New AC's conduct materially
breached the Dealer Agreement, or that such breach constituted
substantial noncompliance within the meaning ofS 56:10-5.

28

franchisor cannot possess the requisite "good cause" unless it also acts in good faith (and without an improper, pretextual motive). New AC then challenges the District Court's explicit conclusion that, once the Court determined that New AC's addition of a Volkswagen line constituted "good cause" for terminating the Chevrolet franchise under NJFPA S 56:10-5, GM's motive behind that termination was entirely irrelevant. See General Motors Corp. , 91 F. Supp. 2d at 740 n.10.9

The District Court rejected this contention, concluding that a franchisor's motivation was irrelevant to the NJFPA "good cause" inquiry, in the course of granting summary judgment in GM's favor on Count III of GM's amended complaint, and on Count Two of New AC's counterclaim, both of which raised the question whether GM's termination of New AC's Chevrolet franchise constituted a violation of S 56:10-5.10 The District Court supported its conclusion by citing to Karl's Sales & Service, Inc. v. Gimbel Bros., Inc., 592 A.2d 647 (N.J. Super. Ct. App. Div. 1991), and Major Oldsmobile, Inc. v. General Motors Corp., No. 95-7595, 1996 U.S. App. LEXIS 11443 (2d Cir. May 17,1996), both of which stated that a party's motivation in terminating an agreement is irrelevant when the terms of the agreement confer upon that party the legal right to terminate its obligations. See Karl's Sales, 592 A.2d at 651

_____

9. With respect to this ground for reversal, New AC is not disputing the District Court's conclusion that New AC "fail[ed] . . . to substantially comply with those requirements imposed upon him by the franchise," N.J. Stat. Ann. S 56:10-5, when it chose to"dual" a Volkswagen line at its dealership over GM's consistent objections. See General Motors Corp., 91 F. Supp. 2d at 739. In fact, we have already rejected the argument that New AC's "dualing" of Volkswagen did not constitute substantial noncompliance within the meaning of S 56:10-5's "good cause" definition. See supra note 8. Rather, New AC is arguing here that, even conceding that its "dualing" amounts to substantial noncompliance, New Jersey law would impose an additional, implicit requirement of good faith before "good cause" under the NJFPA could be said to exist.

10. These two claims are mirror images: In Count Two of its counterclaim, New AC alleges that GM violated S 56:10-5 by terminating its Chevrolet franchise without good cause. In Count III of its amended complaint, GM seeks a declaration that the termination was effected with good cause, and thus satisfied the requirements ofS 56:10-5.

("The law is clear that where the right to terminate a contract is absolute under the wording in an agreement, the motive of a party in terminating such an agreement is irrelevant to the question of whether the termination is effective."); Major Oldsmobile, 1996 U.S. App. LEXIS 11443, at *7-8 ("As long as a party has the legal right to terminate its obligation under the contract, it is legally irrelevant whether the party was also motivated by reasons which would not themselves constitute valid grounds for termination of the contract.") (internal quotation marks, brackets, and citations omitted).

New AC contends that the District Court's reasoning is erroneous in that it fails to take account of the obligations imposed by S 56:10-5 of the NJFPA on a franchisor contemplating a franchise termination, and the manner in which that provision modifies, in the franchise context, the common law rule regarding severance of a private contractual relationship pursuant to a termination at will provision. New AC is surely correct in asserting that S 56:10-5 modifies the termination provisions of all franchise agreements governed by the laws of New Jersey: Even if the terms of a private franchise agreement permit termination at will, S 56:10-5's good cause requirement will supersede that arrangement and impose a good cause requirement on the franchisor's decision. This is because the NJFPA was enacted in large part to counteract the unequal bargaining power between franchisor and franchisee, which would allow a franchisor to leverage its bargaining strength so as to insert provisions in its private agreements with franchisees that would allow it to sever the franchise relationship at will. See, e.g., Westfield Ctr. Serv., Inc. v. Cities Serv. Oil Co., 432 A.2d 48, 53 (N.J. 1981) (noting that "[f]ranchisors have drafted contracts permitting them to terminate or to refuse renewal of franchises at will" and observing that "[t]he New Jersey Legislature was sensitive to the overall problem" when it enacted the NJFPA in 1971).

Karl's Sales and Major Oldsmobile certainly state the proper rule as regards private contractual relationships. They apparently were not, however, called upon to consider the NJFPA's statutory modification of that relationship;

30

Karl's Sales and Major Oldsmobile neither cite to nor discuss the NJFPA in general or S 56:10-5 in particular, presumably because NJFPA claims were never raised in either case. Insofar as the District Court concluded, solely on the authority of Karl's Sales and Major Oldsmobile, that a franchisor's motivation is irrelevant to a claim that a franchisor's termination violated S 56:10-5, its decision was reached in error.

In its appellate briefing and at oral argument, New AC goes further and contends that, under New Jersey law, an examination of whether a franchisor's termination of a franchise was supported by "good cause," within the meaning of S 56:10-5, would necessarily include an inquiry into whether the franchisor acted in good faith (and without some impermissible, pretextual motive). Although this argument is an interesting one, and, as we explain briefly in the margin, New Jersey law offers no clear answer on this point, resolution of this issue is not necessary to our disposition.11 This is because, even were we to assume

_____

11. The plain language of S 56:10-5 strongly suggests that good faith (or the absence of some pretextual motive) on the part of the franchisor is not a requisite element of the "good cause" necessary to terminate a franchisee in accordance with the NJFPA. Importantly, S 56:10-5 does not leave the term "good cause" open, but rather adopts a specialized definition of the phrase: "For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to
failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." N.J. Stat. Ann. S 56:10-5. This statutory definition of "good cause" focuses solely on the objective actions of the franchisee--i.e., whether the franchisee substantially complied with franchise requirements--and not on the subjective motivations of the franchisor--i.e., whether the franchisor's decision was undertaken in bad faith.

Other pertinent provisions within the NJFPA, particularly S 56:10-9, support the idea that a franchisor's motivation is irrelevant to the "good cause" inquiry. Section 56:10-9 allows a franchisee's substantial noncompliance to serve as a complete defense in"any action" instituted under the NJFPA by a franchisee. See N.J. Stat. Ann. S 56:10-9. Although we could find no New Jersey cases on point, a fair reading of that provision suggests that if a terminated franchisee were to bring an action against its franchisor claiming a violation of S 56:10-5 because the

arguendo that a franchisor's motivation bears on the
S 56:10-5 "good cause" inquiry, New AC has failed to
furnish record evidence sufficient to create a genuine issue

_____

franchisor lacked the requisite "good cause" for the decision, the
franchisor could avoid liability simply by demonstrating that the
franchisee failed to substantially comply with its franchise obligations.
We also note that when other jurisdictions have desired to include a
good faith component in the termination provisions of analogous
franchise protection statutes, they have explicitly done so in the
language of the statute. See, e.g., Conn. Gen. Stat. S 42-133v(a) (barring
the termination of a franchise unless the franchisor"has good cause for
. . . termination . . . and has acted in good faith"); Ky. Rev. Stat. Ann.
S 190.045(1) (Michie) (similar); N.D. Cent. Code S 51-07-01.1 (defining
"good cause" as "failure . . . to comply with those requirements imposed
by the written contract" but providing that the franchisor's determination
of whether "good cause" exists "must be made in good faith").

Notwithstanding the foregoing, New Jersey courts, in construing
separate provisions in franchise-related statutes, have imposed good
faith requirements in particular circumstances, despite the statute's
omission of an explicit good faith requirement. For instance, in
Monmouth Chrysler-Plymouth, Inc. v. Chrysler Corp. , 509 A.2d 161 (N.J.
1986), the New Jersey Supreme Court construed a provision of the New
Jersey Motor Vehicle Franchise Act, N.J. Stat. Ann.SS 56:10-16 to
56:10-25, a statutory scheme animated by the same franchise-oriented
concerns as the NJFPA. As noted supra note 1, the NJMVFA allows an
existing automobile dealer to challenge (and eventually enjoin) its
franchisor's decision to relocate a new dealer into the same market area,
by demonstrating that such a move would be "injurious" to the existing
dealer and to the public interest. See N.J. Stat. Ann. SS 56:10-18, 56:10-
19. Section 56:10-23 enumerates several factors that bear on the
question whether a relocation is "injurious," but the provision omits
mention of the franchisor's motivation or good faith as one of the
relevant factors. Nonetheless, despite this statutory silence, Monmouth
Chrysler-Plymouth explicitly held that "an additional criterion to be
considered in determining injury under the Motor Vehicle Franchise Act
is the motivation of the franchisor in designating the new dealer." 509
A.2d at 170 (emphasis added). But even were we to predict, based on
Monmouth Chrylser-Plymouth, that New Jersey would imply a good faith
element into the NJFPA's "good cause" requirement, such a prediction
would not affect our disposition. As we explain in the text above, New AC
has failed to present evidence sufficient to create a genuine issue as to
GM's bad faith, and thus the District Court's summary judgment grant
will be affirmed.

32

as to whether GM acted in good faith (or without a pretextual motive) in terminating New AC's Chevrolet franchise.

New AC's contention that GM acted in bad faith or on pretext in ending its franchise relationship with New AC centers primarily on what we will call the "Project 2000"or "Plan 2000" theory. "Project 2000" is a general business plan developed by GM sometime around 1995, and continuously implemented thereafter. In developing"Project 2000," GM officials examined various individual automobile marketing areas, and sought to create the optimal plan for the sale of GM vehicle lines in those areas. GM officials generally believed that the optimal business strategy would be to have a single dealer, selling and servicing only a single GM line, in each marketing area.

According to New AC's allegations, set forth in its counterclaim and repeated in its appellate briefing and at oral argument, under the "Project 2000" business plan, GM's principal goal for the Hudson County marketing area, in which the New AC dealership was located, was to establish a single dealer as the exclusive Chevrolet franchisee. Furthermore, New AC argues, GM considered the Route 440 area to be the most viable commercial strip in Jersey City, and wanted its designated Jersey City Chevrolet franchise to be located along Route 440. New AC contends that, under the "Project 2000" strategy, GM preferred that the DiFeo dealership, which moved to a Route 440 site in 1995, serve as this exclusive franchisee, and therefore favored closing New AC's Chevrolet dealership. Thus, according to New AC, when GM decided to terminate New AC's franchise, it used New AC's addition of a Volkswagen line as a pretext for finally implementing its single-dealer, single-line "Project 2000" strategy.

At this stage, however, we are reviewing the District Court's grant of summary judgment, and New AC cannot simply rest on its mere allegations concerning a"Project 2000" plan to eliminate its dealership. Rather, New AC must point to "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," Fed. R. Civ. Pro. 56(c), that create a genuine issue of material fact that GM adopted a strategy

33

designed to eliminate New AC's Chevrolet franchise in Jersey City and that GM employed New AC's addition of a Volkswagen franchise as a pretextual reason for effecting that strategy. Based on the record evidence before us, we believe that New AC has failed to create any such genuine issue.

Before examining the specific evidence on which New AC relies, we note that, other than the general contention that the addition of a Volkswagen line was a pretextual reason employed by GM to mask the true motive for its termination of New AC's Chevrolet franchise, the details of New AC's "Project 2000" argument are less than pellucid. We must cobble together the specifics of New AC's argument from incomplete pieces. Therefore, it is important, at the outset, to clarify New AC's contentions so as to get to the heart of New AC's argument concerning GM's bad faith and pretextual motivation.

New AC does not appear to contend, as a general matter, that GM's stated preference for a single-line dealer distribution network is either unreasonable or lacking a legitimate business justification. That is, New AC does not contend that, as a general rule, it is improper for automobile manufacturers to preclude their dealers from "dualing" another vehicle line. See supra Part II.B. Rather, New AC appears to be arguing that, under the particular facts of its case, GM's objection to New AC's "dualing" of a Volkswagen line was not a good-faith application of a single-line preference, but rather a bad-faith, pretextual reason, masking another, true motivation behind GM's action. According to New AC's opening appellate brief, this true motivation is GM's predetermined decision, made as early as the mid-1990s as part of "Project 2000," to sever its franchise relationship with New AC.

In order to survive summary judgment on this NJFPA claim, New AC must point to evidence creating a genuine issue of material fact that, prior to New AC's 1996 decision to add a Volkswagen franchise, GM decided to end its Chevrolet franchise arrangement with New AC, and that GM used New AC's operation of a Volkswagen franchise to obscure the fact that this decision constituted the true motivation behind New AC's termination. As factual support

34

for this theory, New AC focuses primarily on three GM corporate documents. The first is an October 5, 1995 memorandum titled "Dealer Network Planning" and addressed to all GM dealers, which announced GM's future business strategy, an expansion of the "2000 Plan" originally commenced in 1990 (a precursor to "Project 2000"), designed to increase GM's and its dealers' profitability "by assuring that each brand is properly presented to the public, and by renewed emphasis on having the right number of dealers, at the right locations and of the right size." In addition to this general goal, the "Dealer Network Planning" memorandum also expressed a preference for single dealers in a market area selling only single lines of GM vehicles:

> The New General Motors Network Strategy is simple:
>
> Wherever the local market sales potential for the refocused brand provides an opportunity for a profitable dealership selling and servicing that brand alone, General Motors should have a single line, exclusive dealer conforming in image and customer practices to the norm established for that brand.
>
> Further, General Motors brands are not commodities and should never be offered to the public from facilities that also offer competing brands.

In New AC's submission, this "Dealer Network Planning" memorandum sets forth the core of "Project 2000"--i.e., the single-line, single-dealer strategy.

According to New AC, two other corporate documents demonstrate the implementation of this "Project 2000" single-line, single-dealer strategy in the Jersey City region. A report titled "Year 2000 Plan: Essex and Hudson Counties, NJ MDAs: Marketing Area Highlights" includes a section on State Route 440 in Jersey City, the approximate location of both the DiFeo and New AC Chevrolet dealership.12

_____

12. The report itself is not dated. In its opening brief, New AC fixes the date of the document as 1992 or 1993. This is consistent with the statement made in GM's 1995 "Dealer Network Planning" memorandum, which noted that GM had first commenced a "Year 2000" strategy of developing the optimal business plan for dealers in specific market regions in 1990.

{This page intentionally left blank}

In that section, GM identifies the automobile dealerships located at the intersection of State Route 440 and Communipaw Avenue as "the only primary shopping area for Hudson County." The report also contains evaluations of both the New AC Chevrolet dealership and the Bell Chevrolet dealership (which was subsequently acquired by DiFeo). GM observed that both dealerships were in isolated neighborhood areas, away from Route 440's "primary shopping area," and had out-of-date facilities. However, GM appeared much more optimistic about Bell Chevrolet's chances for future economic success.

For Bell, the report's evaluation noted that "[t]he plan is to relocate to the State Route 440 autorow area in Jersey City," while for New AC, the report stated that"viability of the dealer point is questionable" and observed that "[t]he plan is to maintain representation and monitor viability of the point." Finally, a third document, a report dated February 7, 1996 and titled "Dealer Year 2000 Plan," set forth the updated plan for the New AC dealership:"Monitor market conditions -- future viability is questionable."

We are unpersuaded that these documents establish a genuine issue that GM, prior to New AC's 1996 request to add a Volkswagen dealership, made a decision to terminate New AC's Chevrolet franchise. Significantly, none of these documents refers to a decision by or an intent on the part of GM to end its franchise relationship with New AC. In these documents, GM does call New AC's future financial viability into question, but there is no indication that, at the time these documents were drafted, GM had concluded that these economic worries warranted the termination of New AC's Chevrolet dealership.

To be sure, New AC could be asking us to infer from the concerns expressed by GM in these documents over the continued viability of the New AC franchise that, at some point subsequent to February 1996 (the date of the most recent of the three documents, the "Dealer Year 2000 Plan"), GM arrived at the conclusion that termination was necessary, and opportunistically employed New AC's 1996 Volkswagen line addition to mask its true motivation.13 In

_____

13. Of course, concerns over the continued financial viability of a franchise are likely to constitute legitimate, reasonable business reasons

light of the record evidence, however, we believe that "this is not a reasonable inference from the evidence but instead is a leap of faith." Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 95 (3d Cir. 2000). Contrary to New AC's contentions concerning GM's bad faith, the record evidence indicates that in the period between the time that New AC informed GM that it had decided to operate a Volkswagen franchise and the time that GM informed New AC of its final decision to terminate New AC's Chevrolet franchise-- importantly, a period that spanned over one-and-a-half years--GM actually sought to preserve its franchise relationship with New AC.

New AC first informed GM of its decision to seek a Volkswagen franchise on April 2, 1996. Were GM simply using the addition of this vehicle line as a pretext to implement its predetermined decision to eliminate the New AC franchise, one would expect New AC's termination to occur shortly after this notification. Yet, even after again informing New AC on June 24, 1996 that it was opposed to the Volkswagen addition, GM delayed for over eighteen months before finally advising New AC on January 5, 1998 that its Chevrolet franchise was terminated. In the intervening period, GM sent New AC repeated warning letters, furnishing New AC with numerous opportunities to relinquish its Volkswagen franchise and thereby preserve its franchise relationship with GM. In fact, as late as May 13, 1998, the date on which the District Court heard oral argument on New AC's motion for a preliminary injunction barring its franchise termination, GM's counsel represented to the Court that GM was willing to continue New AC's Chevrolet franchise provided that New AC ceased offering the Volkswagen line.

Moreover, GM did not simply issue warnings to New AC; rather, GM sought to forge a compromise position, addressing New AC's desire to add another vehicle line by offering to help establish an Oldsmobile line at New AC's

_____

for the franchise's termination. Therefore, we assume arguendo, as we believe New AC would like us to, that GM's pessimistic assessment of New AC's potential future performance was unwarranted and unjustified.

39

dealership and indicating that GM was willing to supply financial support to New AC. Of course, GM insisted that any compromise include New AC's abandonment of the Volkswagen franchise, but New AC steadfastly refused to take such an action.14 In light of this evidence, we cannot help but conclude that New AC has failed to establish a genuine issue that GM acted in bad faith or out of an improper, pretextual motive in terminating New AC's Chevrolet franchise. Accordingly, we affirm the District Court's grant of summary judgment in GM's favor on Count III of the amended complaint and Count Two of the counterclaim.15

_____

14. At oral argument, New AC offered a new theory to explain the one-and-a-half-year delay between New AC's addition of Volkswagen and GM's notice of franchise termination. According to New AC, at around the time in 1996 that New AC announced its intention to operate a Volkswagen line, DiFeo Chevrolet, the only other Chevrolet franchisee in Jersey City, was in the process of ending its operations and relinquishing its Chevrolet franchise. Were GM at that time to implement its predetermined decision to terminate New AC, it would be left with no Chevrolet franchise representation in the Jersey City market area. Thus, according to New AC, GM was forced to deal, and attempt to compromise, with New AC.

We believe that New AC's proffered theory amounts to pure speculation. Importantly, New AC points to no evidence in the record providing factual support for this theory. For instance, for New AC's account to remain logically consistent, it would need to be shown that DiFeo, or some other Chevrolet franchisee, re-commenced operations in Jersey City some time prior to GM's January 5, 1998 notice of termination to New AC (so that GM could terminate New AC and still retain a single Chevrolet franchisee in Jersey City). We could find no such evidence in the record before us, however.

15. New AC also contests the District Court's grant of summary judgment in GM's favor on Count Three of New AC's counterclaim, which alleges that GM violated S 56:10-7 of the NJFPA when it "impose[d] unreasonable restrictions upon NEW AC, as a franchised motor vehicle dealer, relative to the assertion of its legal or equitable rights respective
to its Chevrolet/Geo franchise." New AC asserts that the Court erroneously granted summary judgment here because it mistakenly believed that New AC waived its right to oppose GM's summary judgment motion by failing to respond to the motion, and/or because the Court mistakenly assumed that its disposition of Count Two of the

40

D.

In short, we believe that none of New AC's challenges
with respect to the District Court's March 8, 2000 order
necessitate reversal of that order. Accordingly, the District
Court's March 8, 2000 order will be affirmed in its entirety.

III. The January 13, 1999 Order

New AC's other principal arguments in this appeal
challenge the District Court's January 13, 1999 order
which dismissed inter alia Count One of New AC's
counterclaim, alleging that GM's course of conduct violated
the ADDCA, and Count Four, alleging that GM's actions
violated the express and implied terms of the Dealer
Agreement. Our review of a district court's decision
granting a motion to dismiss a claim under Fed. R. Civ. Pro
12(b)(6) is plenary. See Weston v. Pennsylvania , 251 F.3d
420, 425 (3d Cir. 2001); Lorenz v. CSX Corp., 1 F.3d 1406,
1411 (3d Cir. 1993). We accept all factual allegations in the
complaint as true, and we draw all reasonable inferences in
the light most favorable to the non-movant. See Weston,
251 F.3d at 425. We may affirm a 12(b)(6) dismissal only if
it is certain that no relief could be granted to the non-
movant under any set of facts which could be proven. See
id.

A. Count One (ADDCA)

1.

In Count One of its counterclaim, New AC alleges that
GM's actions toward it amounted to a violation of the

_____

counterclaim controlled its disposition of Count Three. Examining the
District Court's March 8, 2000 decision, it is clear that the Court
neither
relied on a waiver theory nor confused its Count Two analysis with its
Count Three analysis. Rather, the Court granted summary judgment for
GM on Count Three for the independent reason that New AC failed to
create a genuine issue as to the unreasonableness of the franchise
requirements imposed on New AC. New AC does not challenge this
conclusion on appeal and, accordingly, we will affirm the Court's grant
of summary judgment on Count Three.

41

ADDCA. "The ADDCA is a remedial statute enacted to redress the economic imbalance and unequal bargaining power between large automobile manufacturers and local dealerships, protecting dealers from unfair termination and other retaliatory and coercive practices." Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir. 2000). The substance of the ADDCA cause of action is set forth principally in 15 U.S.C. S 1222, which authorizes an "automobile dealer" to "bring suit against any automobile manufacturer engaged in commerce . . . by reason of the failure of said automobile manufacturer . . . to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. S 1222. Thus, to make out an ADDCA violation, four elements must be established: (1) that the plaintiff is an automobile dealer; (2) that the defendant is an automobile manufacturer engaged in commerce; (3) that there is a manufacturer–dealer relationship embodied in a written franchise agreement; and (4) that the defendant manufacturer failed to act in good faith, thereby injuring the plaintiff dealer. See Northview, 227 F.3d at 93.

The first three elements of an ADDCA claim are clearly established, and thus the dispositive issue is whether, in Count One, New AC sufficiently pleaded GM's failure to act in good faith, as that term is understood in the ADDCA context. Crucial at this point is the understanding that the definition of "good faith" contained in the ADDCA is specialized and narrow. An automobile dealer cannot establish lack of good faith merely by demonstrating that the manufacturer acted arbitrarily, unreasonably, or in a generally unfair manner; rather, the dealer must establish that the manufacturer's conduct constituted "coercion, intimidation, or threats of coercion or intimidation" directed at the dealer. 15 U.S.C. S 1221(e).16

_____

16. The full text of 28 U.S.C. S 1221(e)'s"good faith" definition is as follows:

    The term "good faith" shall mean the duty of each party to any
    franchise, and all officers, employees, or agents thereof to act in
a
    fair and equitable manner toward each other so as to guarantee the
    one party freedom from coercion, intimidation, or threats of
coercion
    or intimidation from the other party: Provided , That
    recommendation, endorsement, exposition, persuasion, urging or
    argument shall not be deemed to constitute a lack of good faith.

42

The narrowness of this definition is evident not only from the statute's plain language, but also from the case law construing S 1221(e). See, e.g., Northview, 227 F.3d at 93 ("[I]t is well established that the duty of`good faith' dealing imposed by the Act must be given a narrow, rather than expansive, construction."). We have expressly stated that coercion or intimidation is a necessary element of a cause of action under the ADDCA, see id., and also have elaborated on the type of conduct that will qualify as coercion or intimidation.

We have explained that mere termination of a franchisee does not, on its own, constitute an ADDCA violation, nor does it afford a presumption that an ADDCA violation has occurred. For instance, our decision in Buono Sales, Inc. v. Chrysler Motor Corp., 449 F.2d 715 (3d Cir. 1971), made clear that "termination [of the franchise] alone will not violate the statute." Id. at 724; see also Milos v. Ford Motor Co., 317 F.2d 712, 716 (3d Cir. 1963) ("The argument that termination before expiration [of the franchise agreement] is prima facie evidence of a violation is untenable. The Act expressly conditions recovery of damages on a failure of the manufacturer to act in good faith. Termination in itself does not suffice."). Rather, to state an ADDCA claim, the danger of termination "must have previously been used as a threat in an attempt to force the dealer to do certain things. Examples . . . include a manufacturer's pressure on a dealer to accept cars, parts, etc. which the dealer does not want or to handle exclusively or sell a quota of parts, accessories, etc." Buono Sales, 449 F.2d at 724.

The type of coercion or intimidation rendered actionable by the ADDCA occurs only when the automobile manufacturer makes a "wrongful demand which will result in sanctions if not complied with." Id. at 724 (internal quotations and citations omitted); see also Rea v. Ford Motor Co., 497 F.2d 577, 585 (3d Cir. 1974) ("[A] violation of this Act results if there is a wrongful demand[made] which will result in sanctions if not complied with.") (internal quotation marks omitted). A demand is wrongful if it pressures the dealer into taking an action it would not take otherwise, see, e.g., id. at 583, 585 (upholding a jury verdict finding Ford in violation of the ADDCA based on

43

Ford's threat to cease shipping Ford vehicles unless the dealer resigned its Oldsmobile franchise in a neighboring town), or impels the dealer into forfeiting its rights under the dealer agreement, see, e.g., Northview, 227 F.3d at 93 (noting that "a manufacturer's coercion of a dealer into relinquishing the right to sell competing car lines may be actionable [under the ADDCA], at least if the dealer's franchise agreement gives it the right to make such sales").

A manufacturer does not make a wrongful demand if it merely insists that the dealer comply with a reasonable obligation imposed by the franchise agreement. For instance, in Globe Motors, Inc. v. Studebaker–Packard Corp., 328 F.2d 645 (3d Cir. 1964), we set aside a jury verdict finding that an automobile manufacturer acted in bad faith, within the meaning of the ADDCA, by requiring its dealer to meet net working capital financial requirements. See id. at 648. In so doing, we observed that the financial requirements, which were expressly set forth in the franchise agreement, made clear "that under the contract the [manufacturer] had [the] right to insist on the [dealer's] compliance with his contractual commitment as to net working capital." Id.; see also Milos , 317 F.2d at 717–18 ("An attempt to enforce an unambiguous contractual obligation . . . can hardly be said to constitute coercion or intimidation.").

This is not to say, however, that a manufacturer who chooses to terminate a dealer can immunize itself from ADDCA liability by simply pointing to a franchise agreement provision with which the dealer ostensibly failed to comply and assert that such provision was the basis for its severance of the franchise relationship. Even if a manufacturer contends that its termination decision was motivated by a desire to enforce a reasonable contractual provision and that it possessed "objectively valid reasons for terminating its relations with a dealer," a franchisee can state a claim for relief under the ADDCA by alleging that the manufacturer possessed "an ulterior motive for its action." Northview, 227 F.3d at 94; cf. Rea, 497 F.2d at 585 (stating that "[a] manufacturer does not breach its duty to act in good faith by terminating a franchise when a dealer has failed to fulfill a reasonable obligation or agreement

44

made in connection with the operation of the dealership," but stressing that "whether a manufacturer has acted with sufficient justification to constitute good faith in bringing pressure to bear on a dealer is a factual question the determination of which will depend on the circumstances arising in each particular case"). That is, a manufacturer's insistence that a dealer adhere to its franchise obligations can constitute a wrongful, sanction-backed demand (and thus the type of coercion or intimidation necessary to state an ADDCA violation), if the manufacturer's reliance on those obligations is motivated by a pretextual, bad-faith reason.

2.

With this understanding of legal framework governing New AC's ADDCA claim in mind, we now turn to New AC's specific allegations. Specifically, Count One avers that GM's "course of wrongful conduct as set forth in this complaint constitutes coercion, intimidation and/or threats of coercion or intimidation within the meaning of 15 U.S.C. S 1221 et seq., and is in violation ofS 1221 et seq., entitling NEW AC to damages." As the language quoted above demonstrates, Count One does not identify the precise actions on the part of GM that New AC believes violate the ADDCA, but it does refer us to the factual allegations contained in the previous portions of the counterclaim (and expressly incorporates the counterclaim's preceding paragraphs by reference).

Examining all of the factual allegations, the District Court determined that New AC's ADDCA claim was focused on two sets of actions allegedly taken by GM: (1) GM's 1995 approval of the relocation of the DiFeo Chevrolet dealership to a site closer to Route 440, a move that, according to New AC, was intended to channel business away from New AC and toward DiFeo; and (2) GM's decision to terminate New AC based on the latter's decision to add a Volkswagen line to its dealership.17 The Court concluded that neither of

_____

17. On appeal, New AC does not dispute the District Court's decision that these two sets of action are the "course of wrongful conduct" alleged in Count One of its counterclaim.

these alleged actions stated a legal claim for relief under the ADDCA. Given our obligation, at the 12(b)(6) stage, to construe all allegations and to draw all reasonable factual inferences in favor of the non-movant, see Weston, 251 F.3d at 425, we are constrained to disagree.

With respect to New AC's allegations concerning the 1995 DiFeo relocation, New AC's core claim appears to be set forth in paragraph 93 of its counterclaim, which states:

> [GM] . . . may well have a hidden agenda as[GM's] Project 2000 is implemented which may include the unlawful attempt to force NEW AC out of business by establishing the DiFEO dealership at a site that invades NEW AC's recognized area of focus of sales penetration. Said action directs Chevrolet/Geo business away from NEW AC to DiFEO; injures NEW AC's heretofore existent Chevrolet business so profoundly as to render NEW AC relatively unprofitable.

Paragraph 93 can be fairly read as alleging that GM, through the approval of DiFeo's relocation, brought pressure to bear on New AC in order to impel New AC to forfeit one of the rights to which it is entitled under the franchise agreement, i.e., the right to continue as a Chevrolet franchisee through the full life of the Dealer Agreement, without having its franchise prematurely terminated.

Although provisions of the Dealer Agreement do appear to confer GM with the authority to make such a dealer relocation--for instance, Article 4.3 provides that "the relocation of an existing dealer," such as DiFeo, is "within the sole discretion" of GM, "pursuant to its business judgment"--we have noted above that a manufacturer cannot shield itself from ADDCA liability by merely relying on an objective provision of a franchise agreement when the dealer claims that the manufacturer's reliance on such a provision is pretextual. See Northview, 227 F.3d at 94 (stating that a manufacturer's "objectively valid reasons" for a decision will not preclude an ADDCA claim, if the dealer can demonstrate that the manufacturer possessed"an ulterior motive for its action"). New AC makes just an

46

allegation of pretext in paragraph 93, claiming that GM's reason for approving the DiFeo relocation was not motivated by a legitimate business goal, but rather was part of "Project 2000' "s "hidden agenda."

We reach a similar conclusion with respect to the second set of actions alleged to violate the ADDCA, i.e., GM's termination of New AC's Chevrolet franchise based on New AC's "dualing" of a Volkswagen line. Here, New AC could reasonably be characterized as asserting that it was entitled to sell a Volkswagen line of vehicles under the terms of the Dealer Agreement, and that GM's persistent refusal to permit such "dualing" constituted an attempt by GM to pressure New AC into forfeiting this entitlement. To be sure, as the District Court recognized in its opinion, Article 4.4.2 unambiguously requires that a franchisee receive prior written authorization from GM before adding a vehicle line to its dealership, and GM's actions could be characterized as a mere attempt to require New AC to comply with its reasonable franchise obligations. Again, however, a dealer can state an ADDCA claim against a manufacturer, notwithstanding the manufacturer's reliance on an objectively valid contractual provision, by establishing that the manufacturer's motive is a pretextual or bad faith one. New AC's complaint in this case, when construed under our liberal Fed. R. Civ. Pro. 12(b)(6) standard, see Weston, 251 F.3d at 425, can be fairly read as alleging that GM's reliance on Article 4.4.2 of the Dealer Agreement was not a good-faith business decision, but rather a pretextual attempt to have New AC forfeit its right to sell additional non-GM vehicle lines.

3.

Although we conclude that the District Court erred in dismissing Count One of New AC's counterclaim, we believe the Court's error to be harmless, as it did not impact New AC's substantial rights. See 28 U.S.C. S 2111 ("On the hearing of any appeal . . . in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); Fed. R. Civ. Pro. 61 ("[N]o error or defect in any ruling or order or in anything done or omitted

47

by the court . . . is ground for . . . vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.").18 We hold a non-constitutional legal error harmless if it is highly probable that the error did not affect the judgment. See McQueeney v. Wilmington Trust Co., 779 F.2d 916, 924-25 (3d Cir. 1985). Thus, in making this harmless error determination, we must be well-satisfied that the error did not prejudice a party, but we need not disprove every reasonable possibility of prejudice. See Ballay v. Legg Mason Wood Walker, Inc., 925 F.2d 682, 694 n.15 (3d Cir. 1991); United States v. Jannotti, 729 F.2d 213, 219-20 & n.2 (3d Cir. 1984).

It is clear that New AC was not prejudiced by the District Court's failure to liberally construe Count One of the counterclaim. With respect to New AC's claim that GM violated the ADDCA when it terminated New AC for "dualing" a Volkswagen line, we note that the Court permitted Count II of GM's amended complaint to proceed to discovery. Count II of the amended complaint, seeking a declaration that New AC's termination did not violate the ADDCA, is a mirror image of the relevant portion of Count One of the counterclaim, and thus necessarily requires an adjudication as to whether GM's termination decision amounted to coercion and intimidation within the meaning of 15 U.S.C. S 1221(e). Count II remained alive through discovery, thus affording New AC the opportunity to obtain evidence of coercive or intimidating conduct on the part of GM in connection with the Chevrolet franchise termination, and to have that evidence considered by the District Court.19

_____

18. Although Fed. R. Civ. Pro. 61 technically applies only to the district courts, see Fed. R. Civ. Pro. 1 ("These rules govern the procedure in the United States district courts . . . ."), the Supreme Court has admonished the Courts of Appeals to "act in accordance with the salutary policy embodied in Rule 61." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984). Moreover, the Supreme Court has observed that the federal harmless error statute, 28 U.S.C. S 2111, applies directly to the Courts of Appeals, and "incorporates the same principle as that found in Rule 61." Id.
19. In its March 8, 2000 opinion, the District Court in fact granted summary judgment in GM's favor on Count II, observing that New AC, even after the completion of discovery, failed to furnish any facts establishing coercion or intimidation on GM's part. See General Motors Corp. v. New A.C. Chevrolet, Inc., 91 F. Supp. 2d 733, 740 (D.N.J. 2000).

48

We reach the same conclusion with respect to New AC's claim that an ADDCA violation occurred when GM approved the 1995 DiFeo relocation. This ADDCA claim is inextricably linked with New AC's "Project 2000" bad faith theory. See supra Part II.C (summarizing the"Project 2000" theory). Paragraph 93 of the counterclaim, for instance, explicitly alleges that the decision to approve DiFeo's relocation was made as a result of GM's "Project 2000" "hidden agenda." In essence, New AC is contending that GM's relocation approval was motivated by a desire to constructively or formally terminate New AC as a Chevrolet franchisee so as to establish a competing dealership, DiFeo, as GM's exclusive Chevrolet dealer in Jersey City, in furtherance of a the single-dealer goal embodied in the "Project 2000" business strategy.

This close nexus between New AC's "Project 2000" theory and its bad faith allegations proves significant to our harmless error analysis. Although an erroneous dismissal of a claim will ordinarily work a prejudice on the party asserting the claim, in that the dismissal will remove the claim from the litigation and prohibit the party from pursuing discovery with respect to the dismissed claim, the factual and procedural circumstances of this case clearly indicate that New AC's opportunity to gather evidence regarding the "Project 2000" plan was not impeded in any respect. The history of the proceedings before the District Court demonstrates that New AC has had a full and fair opportunity to participate in discovery concerning the "Project 2000" theory, and thus had the chance to establish a genuine issue as to whether GM did indeed act in bad faith in its course of conduct toward New AC. As explained at length supra in Part II.C, New AC failed to furnish the record evidence necessary to create a genuine issue that GM adopted, in bad faith, a strategy designed to eliminate New AC's franchise in Jersey City. Thus, even if the relocation portion of Count One had remained live in the litigation, we are firmly convinced, based on the clear record evidence in this case, that New AC would not have succeeded in establishing a genuine issue that GM's approval of the DiFeo relocation was actuated by a bad-faith, "Project 2000" motive.

49

We are thus satisfied that the District Court's legal error in construing the allegations made in Count One of the counterclaim did not work a prejudice on New AC. Accordingly, we will affirm the District Court's dismissal of Count One.

B. Count Four (Breach of Dealer Agreement)

In Count Four of the counterclaim, New AC alleges, rather inartfully, that certain actions taken by GM with respect to New AC violated the express and implied terms of the Dealer Agreement. The relevant allegations are contained in paragraph 116 of the counterclaim, which states in full:

> During the ongoing term of the NEW AC franchise, [GM] breached the expressed and implied terms and provisions of those agreements: by relocating/adding a Chevrolet/Geo franchise and thereby establishing a Chevrolet/Geo dealership within an unreasonable geographic and marketing distance from NEW AC; by attempting to interfere with, render impotent and/or otherwise terminate NEW AC's Chevrolet/Geo franchise by destroying the economic viability of same by relocating/adding a Chevrolet/Geo franchise and dealership to a geographic location whereby it will draw and drain significant business away from NEW AC, and by affording and sanctioning DiFEO Chevrolet/Geo's resultant and grossly unfair competitive advantage to the direct disadvantage of and damage to NEW AC; by refusing to comply with its self-imposed mediation process, and by using the unfair competitive advantage of the dualed DiFEO dealership to effect the actual or constructive termination of NEW AC in order to reduce the number of Chevrolet/Geo dealers in the New York New Jersey Metropolitan area in accordance with the dictates of Project 2000 as expressed.

Based on these allegations, New AC presents two principal contentions. First, New AC asserts that the District Court erred in deciding that Count Four did not encompass a claim that GM breached an implied duty of good faith and fair dealing by predetermining the outcome

50

of its own management review process. In addition, New AC contends that the District Court erroneously concluded that an implied duty of good faith and fair dealing did not even arise in connection with the provision of the Dealer Agreement governing GM's power to authorize and approve the relocation of a competing franchisee.[20] Before turning to

_____

20. New AC also argues that the District Court erroneously construed Count Four as not encompassing a claim that GM's refusal to permit the addition of a Volkswagen line to New AC's dealership breached the express terms of the Dealer Agreement. We agree that the Court's reading of New AC's complaint was erroneous. To be sure, paragraph 116 of Count Four of the counterclaim, quoted above, does not reference GM's refusal to permit New AC to operate a Volkswagen franchise. Nonetheless, a few dozen paragraphs earlier, New AC clearly makes the requisite allegation: In paragraph 92, New AC states that GM's "refusal to permit NEW AC to establish a Volkswagen franchise. . . is in violation of the FRANCHISE [i.e., the terms of the Dealer Agreement]." Although New AC's complaint is awkwardly drawn--its breach of contract claim based on GM's refusal to allow the "dualing" of a Volkswagen line is not included with the general list of contract claims raised in Count Four, but rather is set forth in paragraph 92, under the caption "The New AC Volkswagen Franchise Acquisition"--given our liberal notice pleading regime, see Weston, 251 F.3d at 429-30, we will not hold New AC's drafting irregularities against it.

Nonetheless, we will affirm the District Court's dismissal of this portion of Count Four, concluding that any error committed by the District Court was harmless, as it did not work a prejudice on New AC. See supra Part III.A.3. (setting forth the applicable harmless error standard). Although the District Court dismissed Count Four of the counterclaim, Count I of GM's amended complaint remained alive in the litigation. The claim asserted by GM in that count--that GM's termination of New AC, on the ground that New AC persisted in operating a Volkswagen franchise over GM's objection, was lawful under the terms of the Dealer Agreement--fairly encompasses New AC's claim that GM's refusal to permit the Volkswagen addition represented a breach of the franchise agreement. By adjudicating Count I, the District Court would necessarily determine whether GM's objection to the added Volkswagen franchise was in accordance with the Dealer Agreement between GM and New AC. Because Count I remained active in the litigation, proceeded to discovery, and was ultimately adjudicated by the District Court, see General Motors Corp., 91 F. Supp. 2d at 738-39, we conclude that the District Court's failure to fully apply the liberal pleading rules to New AC's claims respecting GM's objection to the Volkswagen franchise did not affect New AC's substantial rights, and thus amounted to nothing more than harmless error.

51

each of these contentions, we note that the District Court decided, and the parties on appeal agree, that Michigan law governs the implied covenant of good faith issue. This is because of the express choice of law provision contained in Article 17.12 of the Dealer Agreement, which states in relevant part that "[t]his agreement is governed by the laws of the State of Michigan."21

1.

New AC contends that the District Court erred in construing New AC's counterclaim when the Court concluded that Count Four did not include a claim for a breach of the implied covenant of good faith and fair dealing based on the fact that GM allegedly predetermined the outcome of its management review process. The District Court declined to address this breach of contract claim on the ground that such a contention appeared nowhere in Count Four of the counterclaim. New AC submits that the District Court's decision was erroneous, in that the Court failed to liberally construe the allegations of New AC's counterclaim. We disagree.

The franchise agreement between GM and New AC establishes a private mechanism for the resolution of disputes between the manufacturer and dealer arising out of the respective obligations imposed on them by the franchise arrangement. This mechanism is described in a document entitled "Dispute Resolution Process for Chevrolet, Pontiac, Oldsmobile or GMC Truck Dealers," and the basic procedure is summarized in that document's foreword. In essence, if a dealer is dissatisfied with one of GM's decisions, believing it to be inconsistent with its rights under the Dealer Agreement, its first recourse is to seek "Division Management Review."

In general, the dealer initiates the "Division Management Review" process by sending a letter to GM's General Sales

_____

21. New Jersey gives effect to contracting parties' private choice of law clauses unless they conflict with New Jersey public policy. See Instructional Sys., Inc. v. Computer Curriculum Corp., 614 A.2d 124, 133 (N.J. 1992). We ascertain no such conflict here.

and Service Manager within 60 days of receipt of the challenged decision. The letter must clearly request management review and state the reasons for the dealer's challenge. If the dealer objects to the result of the "Division Management Review" process, it can seek binding arbitration as an alternative to instituting a legal action, but such binding arbitration will occur only if both the dealer and GM mutually agree to pursue it. At the same time, the administrator of the private dispute resolution process can attempt to explore the option of informal, non-binding mediation with GM and the dealer. Again, however, the dispute will be mediated only upon the dealer's and GM's mutual agreement. In considering New AC's contention, we assume arguendo that Michigan law would impose an obligation on GM to conduct its private dispute resolution process in good faith. Nonetheless, examining the substance of New AC's counterclaim, it is evident that, in its counterclaim, New AC fails to allege the facts necessary to show that a breach of such an implied covenant occurred.

New AC's counterclaim does reference the Management Review process described above in several places, although no such allegations appear under the Count Four heading. In various paragraphs of its counterclaim, New AC states that it sought administrative review of two decisions made by GM: GM's 1998 decision to terminate New AC's Chevrolet franchise, and its earlier 1996 decision refusing to permit the addition of a Volkswagen line to New AC's dealership. First, in paragraph 72 of its counterclaim, New AC alleges that on January 26, 1998, it requested "Management Review of GM's January 5, 1998 termination notice." Importantly, New AC does not, however, claim that GM's response to this Management Review request was improper in any fashion, let alone assert that GM's conduct of the review procedure breached an implied covenant of good faith. Put simply, with regard to administrative review of GM's decision to terminate New AC's Chevrolet franchise, New AC's complaint simply alleges that such review was sought; it does not claim that GM's handling of the review process was wrongful in any respect. Accordingly, we cannot say that this allegation suffices for 12(b)(6) purposes

53

to state a claim for a breach of an implied covenant of good faith.

New AC does go somewhat further in its allegations concerning administrative review of GM's earlier 1996 decision to refuse New AC's request to add a Volkswagen franchise to its dealership. In paragraphs 37 through 43 of the counterclaim, New AC alleges that it sought Management Review of this refusal, and, in paragraph 47, New AC asserts that the Management Review that was conducted "did not comport with the purpose, intent and spirit of [GM's] mandated dispute resolution process." Although this last allegation does maintain that GM's use of the Management Review procedure was faulty in some abstract sense, New AC fails to allege the reasons why GM's internal review was unlawful in general, or in breach of an implied covenant of good faith in particular. Moreover, New AC's allegations do not establish the factual basis for this claim. That is, New AC's counterclaim does not include factual allegations demonstrating why the administrative review GM conducted in connection with its 1996 refusal of the Volkswagen addition did not comply with the purpose of the Management Review process.

Perhaps New AC could have alleged that the review omitted the steps specified in GM's "Dispute Resolution Process" document, or that New AC was denied a meaningful opportunity to present its case to the relevant decision-makers, but New AC's counterclaim does not contain these types of allegations. New AC's minimalist, conclusory allegations--amounting, in essence, to nothing more than a bare bones claim that GM's decision was "wrongful in the air"--do not suffice to cross the 12(b)(6) threshold. Cf. 2 James Wm. Moore, Moore's Federal Practice S 12.34[1][b], at 12-61 to 12-63 (3d ed. 2001) ("Liberal construction has its limits, for the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists on which relief could be accorded the pleader. . . .[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss. While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective

54

characterizations, or legal conclusions.") (internal quotation marks, citations, and footnotes omitted).

Finally, New AC also relies on language in paragraph 116 of Count Four, which states inter alia that GM "breached the expressed and implied terms and provisions" of its franchise agreement "by refusing to comply with its self-imposed mediation process." However, as set forth above in our summary of the "Dispute Resolution Process" document, such voluntary mediation is initiated only when the administrator of the dispute resolution process seeks to explore such an option with GM and the dealer, and requires the mutual agreement of both GM and the dealer before it can be pursued. Canvassing New AC's counterclaim, we can find no allegation that either New AC or the dispute resolution administrator requested the institution of voluntary mediation, or that any such request was denied. Thus, New AC's conclusory allegation that GM breached an implied covenant of good faith "by refusing to comply with its self-imposed mediation process" does not clear the 12(b)(6) hurdle.

2.

New AC also contends that the District Court erred in deciding, as a matter of law, that the Dealer Agreement provision granting GM the power to approve the relocation of competing franchisees did not give rise to an implied covenant that GM would make that decision in good faith. The District Court offered this construction in connection with its dismissal of the portion of Count Four in which New AC alleged that GM breached an implied covenant of good faith and fair dealing by approving the 1995 relocation of DiFeo Chevrolet, a competing franchisee, to a more desirable commercial location, thereby siphoning business away from New AC.22

Although Michigan law on the implied covenant of good

_____

22. New AC made a virtually identical contention regarding GM's approval of the DiFeo relocation in paragraph 93 of Count One of its counterclaim, which appeared to allege inter alia that this relocation approval violated the ADDCA. See supra Part III.A.2.

faith is rather sparse, it can be fairly said that Michigan recognizes that such a covenant can arise in certain circumstances, depending on the nature of the contractual arrangement between the parties. Specifically, two principles supply the framework for analyzing whether a contractual provision gives rise to an implied covenant of good faith. First, under Michigan law, "[w]here a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." Burkhardt v. City Nat'l Bank of Detroit, 226 N.W.2d 678, 680 (Mich. Ct. App. 1975). At the same time, "Michigan law does not imply the good faith covenant where parties have `unmistakably expressed' their respective rights." Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873, 877 (5th Cir. 1989) (applying Michigan contract law).23

_____

23. In its appellate brief, GM argues that this portion of Count Four of the counterclaim does not state a claim for legal relief because Michigan law does not recognize an independent cause of action for breach of an implied covenant of good faith. This characterization of Michigan law is technically correct, as Michigan courts have stated on numerous occasions that "Michigan does not recognize an independent tort action for an alleged breach of a contract's implied covenant of good faith and fair dealing." Ulrich v. Federal Land Bank of St. Paul, 480 N.W.2d 910, 911 (Mich. Ct. App. 1991) (per curiam) (emphasis added); see also Kewin v. Massachusetts Mut'l Life Ins. Co., 295 N.W.2d 50, 56 (Mich. 1980); Dahlman v. Oakland Univ., 432 N.W.2d 304, 306 (Mich. Ct. App. 1988) (per curiam). However, we do not believe this settled Michigan rule to be applicable to New AC's specific claim. As the allegations set forth in paragraph 116 of New AC's counterclaim make clear, see supra Part III.B, New AC is not asserting that GM's alleged bad faith breached a duty that GM owed to New AC independent of the contractual obligations fixed by the Dealer Agreement and is not claiming that such a breach should be independently actionable, cf. Kewin , 295 N.W.2d at 56; Dahlman, 432 N.W.2d at 306. Rather, fairly read, Count Four of New AC's counterclaim alleges that GM's conduct in approving the DiFeo relocation breached an implied covenant of good faith emanating from the terms of the Dealer Agreement. As noted in the text above, cases such as Hubbard and Burkhardt make clear that, under Michigan law, such an implied obligation can arise when, for instance, the specific contractual terms make a party's performance under the contract entirely discretionary.

New AC's allegation concerning GM's approval of the DiFeo relocation thus required the District Court to determine whether the terms of the Dealer Agreement regarding GM's approval of competing dealers' relocations gave rise, under the framework set forth above, to an implied covenant that GM render that decision in good faith. The pertinent provision of the Dealer Agreement is Article 4.3, captioned "Establishment of Additional Dealers," which provides:

> [GM] reserves the right to appoint additional dealers but [GM] will not exercise this right without first analyzing dealer network planning considerations.
>
> Prior to establishing an additional dealer within Dealer's Area of Primary Responsibility, [GM] will advise Dealer in writing and give Dealer thirty days to present relevant information before [GM] makes a final decision. [GM] will advise Dealer of the final decision, which will be made solely by [GM] pursuant to its business judgment. . . .
>
> Neither the appointment of a dealer at or within three miles of a former dealership location as a replacement for the former dealer nor the relocation of an existing dealer will be considered the establishment of an additional Dealer for purposes of this [section]. Such events are within the sole discretion of [GM], pursuant to its business judgment.

(emphasis added).

It is difficult (if not impossible) to read Article 4.3 as anything other than a provision making the relocation decision a matter for GM's own discretion, a provision that, under existing Michigan contract law, would give rise to a good faith obligation. Article 4.3, by its terms, states that the "relocation of an existing dealer"--in this case, the moving of DiFeo Chevrolet from its Kennedy Boulevard location to a site closer to Route 440--is "within the sole discretion of [GM], pursuant to its business judgment." Michigan law, through decisions such as Burkhardt, clearly teaches that it is these precise situations--situations in which one party retains unfettered control over part of its performance under a contract--that call most strongly for

57

the application of an implied covenant of good faith. See, e.g., Burkhardt, 226 N.W.2d at 680 ("Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith."); see also Ferrell v. Vic Tanny Int'l, Inc., 357 N.W.2d 669, 672-73 (Mich. Ct. App. 1984) (per curiam) (holding that a health club's authority, under its contract with club members, to promulgate rules and regulations governing the use of its facilities was sufficiently discretionary to give rise to an implied covenant of good faith and fair dealing); cf. Paradata Computer Networks, Inc. v. Telebit Corp., 830 F. Supp. 1001, 1006 (E.D. Mich. 1993) (observing that "discretion is the hallmark of the covenant" of good faith).24

_____

24. The District Court reached the opposite conclusion, deciding that Article 4.3 of the Dealer Agreement unambiguously expressed the obligations of the parties in regard to the DiFeo relocation decision, and thus did not yield any implied covenant of good faith. In so doing, the Court relied almost exclusively on Hubbard, a case from the Court of Appeals for the Fifth Circuit, applying Michigan law to a dispute between an automobile dealer and the vehicle manufacturer concerning the relocation of a franchise, a dispute similar to the disagreement between GM and New AC in this case over the DiFeo relocation.

In Hubbard, a Chevrolet franchisee sought to move its location to a site other than the one specified in its dealership agreement. Much like the agreement in this case, the contract in Hubbard required the franchisee to receive prior written approval from GM for any move of the dealership premises. See Hubbard, 873 F.2d at 874. GM denied its franchisee's request, and the franchisee brought suit alleging inter alia that the relocation provision requiring GM's prior written approval carried with it an implied covenant that GM's decision would be made in good faith. See id. at 875. The Fifth Circuit disagreed, concluding that the relevant relocation provision did not give rise to any implied covenant, since it unmistakably and fully expressed the respective rights of GM by precisely identifying the dealer's original location and "flatly preclud[ing] relocation absent GM's approval." Id. at 878. The Court stressed that the dealer agreement "gave GM the authority to approve or disapprove relocation for its own reasons, and thus set out the limits of what the contract requires of the parties." Id.

In this case, the District Court concluded that Article 4.3 of the Dealer Agreement was analogous to the contractual provision at issue in

58

However, our conclusion that the District Court committed error in construing Michigan law does not necessitate reversal of this portion of the Court's January 13, 1999 order, because we consider this error to be harmless. See supra Part III.A.3 (setting forth the applicable harmless error standard). It is abundantly clear from New AC's amended counterclaim, its appellate brief, and its contentions at oral argument, that New AC's theory behind GM's bad faith is integrally and inextricably linked with the manufacturer's "Project 2000" or "Plan 2000" business strategy. For instance, paragraph 113 of Count Four of the counterclaim expressly states that GM's relocation decision was intended "to effect the actual or constructive termination of NEW AC in order to reduce the number of Chevrolet/Geo dealers in the New York New Jersey Metropolitan area in accordance with the dictates of Project 2000 as expressed."

As we explained supra in Part II.C and again in Part III.A.3, New AC has had a full and fair opportunity to participate in discovery concerning the "Project 2000" theory, in order to establish a genuine issue as to whether GM did indeed act in bad faith. Yet, New AC has not succeeded in establishing a genuine issue that GM adopted a strategy designed to eliminate New AC's franchise in

_____

Hubbard, in that both clearly conferred manufacturer GM with the authority to approve or disapprove the dealership move for its own reasons. We believe this conclusion and rationale is at considerable odds with the principle of Michigan law stated in Burkhardt, which makes clear that an implied covenant of good faith arises precisely in those situations "[w]here a party to a contract makes the manner of its performance a matter of its own discretion." Burkhardt, 226 N.W.2d at 680. Most provisions conferring blanket discretion on a decision maker, such as the relocation provision in Article 4.3, will give that decision maker the power to make the choice for its own reasons; such is the nature of the exercise of unfettered discretion. Were we to construe Article 4.3's language--which on its face confers unfettered and unbounded discretion to GM--as an unmistakable and exhaustive expression of the parties' obligations, we would leave few if any situations in which the implied covenant of good faith would ever arise. We believe such a result would be in significant tension with extant Michigan contract law.

59

Jersey City and thus acted in bad faith in its course of
dealing with New AC. Therefore, even if the District Court's
interpretation of Michigan contract law had not been in
error, and New AC's claim concerning the DiFeo relocation
approval had remained active in the litigation, we are firmly
convinced, based on the clear record evidence in this case,
that New AC would not have succeeded in establishing a
genuine issue that GM's approval of the DiFeo move was
actuated by a bad-faith, "Project 2000" motive.
Consequently, we are satisfied that New AC was not
prejudiced by the District Court's error, and consider such
error to be harmless.

3.

In sum, we conclude that none of New AC's challenges
with respect to the District Court's January 13, 1999 order
necessitate reversal of that order. Accordingly, the District
Court's January 13, 1999 order will be affirmed in its
entirety.25

_____

25. In addition to the four principal points discussed in the text above,
New AC also raises a series of challenges to four other sets of orders,
and to the District Court's award of attorneys fees in GM's favor.
Because we find these arguments insubstantial and unpersuasive, we
deal with them summarily here.

The May 15, 1998 Order

Following the filing of its counterclaim, New AC moved for a
preliminary injunction blocking GM's scheduled termination of New AC's
Chevrolet franchise. The District Court denied New AC injunctive relief in
a May 15, 1998 order. The challenge to this order that New AC raises on
this appeal presents a straightforward application of the claim preclusion
doctrine, since the propriety of this preliminary injunction denial has
already been appealed to this Court by New AC on a prior occasion and
been resolved against New AC. All of the elements necessary to grant our
prior order claim preclusive effect are present: The prior order
represents
a final adjudication of the question whether New AC was entitled to
preliminary injunctive relief; that question was litigated before this
Court
by the same parties that are before us today; and New AC's current
appeal raises the exact question that was decided in our prior order. See
Corestates Bank, N.A. v. Huls America, Inc., 176 F.3d 187, 194 (3d Cir.
1999) (setting forth the elements of the claim preclusion doctrine). Quite

60

IV. Conclusion

We affirm the orders of the District Court in all respects.

(Text continued on page 63)
_____

clearly, the claim preclusion doctrine does not permit New AC to re-visit
and re-argue issues already decided by this Court in the same litigation.
Accordingly, we dismiss the portion of New AC's appeal challenging the
District Court's May 15, 1998 order.

The August 26, 1998 Order

On June 16, 1998, New AC moved to dismiss GM's declaratory
judgment action under Fed. R. Civ. Pro. 12(b)(6). The District Court
denied New AC's motion in an order entered on August 26, 1998, and
New AC now challenges that dismissal. Our review of the District Court's
denial of a motion to dismiss is plenary. We accept all factual
allegations
in the complaint as true, and we draw all reasonable inferences in the
light most favorable to the non-movant. See Weston v. Pennsylvania, 251
F.3d 420, 425 (3d Cir. 2001). We believe that a mere examination of the
face of GM's original complaint suffices to establish its legal adequacy
for
12(b)(6) purposes, and therefore affirm the District Court's August 26,
1998 order.

The March 8, 1999 and April 28, 1999 Discovery Orders

New AC also questions the propriety of two orders entered by the
Magistrate Judge during the course of discovery, on March 8, 1999 and
April 28, 1999, respectively. According to New AC, as part of the
discovery conducted on Counts Two and Three of its counterclaim,
alleging that GM violated the NJFPA by inter alia imposing unreasonable
standards of performance on New AC in contravention of S 56:10-7(e),
New AC sought documents from GM regarding GM's dealer network. In
the March 8, 1999 order, the Magistrate Judge rejected New AC's broad
request, and instead required GM to furnish only those documents
related to New AC. On April 28, 1999, the Magistrate Judge denied New
AC's motion for reconsideration of the March 8, 1999 decision. On
appeal, New AC contends that this limitation was erroneous, since New
AC should have been allowed to gather information regarding GM's
relationships with other franchisees--e.g., the type of performance
standards imposed on those franchisees--in order to help establish that
the standards placed on New AC were unreasonable.

Under Fed. R. Civ. Pro. 72(a), once a magistrate judge to whom a
nondispositive pretrial matter is referred enters a written order, the
parties have ten days after service of that order within which to serve

61

and file objections, which will be considered by the district court. See Fed. R. Civ. Pro. 72(a). The Rule makes clear that, following this ten-day period, "a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made." Id.; see also Continental Cas. Co. v. Dominick D'Andrea, Inc., 150 F.3d 245, 252 (3d Cir. 1998). The record contains no indication that New AC attempted to file objections to the Magistrate Judge's March 8, 1999 or April 28, 1999 decisions with the District Court. Accordingly, New AC has waived any challenge it had to these two discovery orders.

The August 4, 1999 Order

New AC also employs the instant appeal to challenge the District Court's August 4, 1999 denial of its motion seeking the recusal of the District Judge originally assigned to the litigation and the vacatur of all
of the orders entered by that Judge during the course of the litigation. In June of 1999, New AC brought this motion seeking the disqualification of the Judge pursuant to 28 U.S.C.SS 144 and 455. The District Court forcefully rejected New AC's motion both on the ground that the motion was untimely and that it failed on the merits. We review a district court's denial of a motion for recusal for abuse of discretion. See Blanche Road Corp. v. Bensalem Township, 57 F.3d 253, 265 (3d Cir. 1995). We agree with the District Court that New AC's recusal motion fell outside of 28 U.S.C. S 144's 10-day time limit, see 28 U.S.C. S 144 (providing that an affidavit setting forth the facts and reasons for recusal "shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time"). We also agree that it was entirely lacking in merit. We therefore conclude that the Court did not abuse its discretion in denying the motion, and affirm the Court's August 4, 1999 order.

Attorneys Fees

In the conclusion of its opening appellate brief, New AC requests that we set aside all attorneys fees and costs awarded by the District Court to GM in this case. The District Court granted these fees in connection with its determination, in its April 5, 2000 order, that New AC knowingly infringed GM's trademarks and breached Article 17.5 of the Dealer Agreement by continuing to use GM marks even after its termination as a Chevrolet franchisee, and in connection with its May 11, 2000 order holding New AC in civil contempt for failing to comply with the Court's directive to cease the use of GM marks.

We find no basis for vacatur of the District Court's attorneys fees and

62

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

costs award. New AC has never challenged the Court's grant of summary judgment in GM's favor on the trademark infringement claims or on the claim that New AC's post-termination use of the marks constituted a breach of Article 17.5, and has never argued that the Court's civil contempt finding was erroneous. Because our jurisprudence makes clear that "[a]n issue is waived unless a party raises it in its opening brief," Reform Party of Allegheny County v. Allegheny County Dep't of Elections, 174 F.3d 305, 316 n.11 (3d Cir. 1999) (citation omitted), and because we believe that a mere conclusory request for relief, unaccompanied by any proffered basis for the grant of such relief, does not suffice to raise an issue, we will deny New AC's request to vacate the District Court's attorneys fees and costs award.